THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN LATONA, Defendant-Appellant.

Second District    No. 2—92—1014

Opinion filed June 21, 1994.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, and Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mount Vernon, for appellant.

Daniel A. Fish, State's Attorney, of Dixon (William L. Browers, Stephen E. Norris, and Mary H. Doyle, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE PECCARELLI delivered the opinion of the court:

The State charged defendant, John Latona, with one count each of solicitation of murder and solicitation of murder for hire (Ill. Rev. Stat. 1989, ch. 38, pars. 8—1.1(a), 8—1.2(a) (now 720 ILCS 5/8—1.1(a), 8—1.2(a) (West 1992))). These charges stemmed from defendant's allegedly requesting Randall Jordan, an undercover police officer, to kill his daughter's fiance. Defendant raised the affirmative defense of

entrapment (Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992))). After a bench trial, defendant was found guilty of solicitation of murder. The trial court imposed an extended-term sentence of 40 years' imprisonment.

On appeal defendant claims that (1) the evidence demonstrates he was guilty only of solicitation of aggravated battery; (2) the trial court did not have the authority to impose an extended-term sentence for solicitation of murder; and (3) the trial court improperly considered as a factor in aggravation that his conduct threatened serious harm.

After this court reversed the circuit court's order granting defendant's motion to suppress statements and remanded the cause for further proceedings (*People v. Latona* (1991), 218 Ill. App. 3d 1093), the trial court dismissed the count alleging solicitation of murder for hire. At the trial on the remaining count, Michael Wagers testified that he first met defendant about 15 years earlier while they were both inmates at the Menard Correctional Center. In 1989, he and defendant were inmates at the Dixon Correctional Center (Dixon). According to Wagers, defendant was very protective of his daughter, Sheila. Sometime in the spring of 1989, defendant told Wagers that he was unhappy that his daughter was dating a man named Danny Shamoon. On one occasion, defendant said to Wagers, "Man, I'd sure like to get that sand nigger killed."

Wagers testified that he was a four-star general in a Chicago street gang called the Gaylords. He told defendant that, for a price, he could arrange to have Shamoon killed. Wagers suggested having his brother contact defendant. Defendant replied that he would have to pay Wagers by giving him antique furniture.

Wagers further testified that he thought about his conversation with defendant and concluded that he did not want to get involved in a "murder rap." Accordingly, he contacted Jerry Sternes, an investigator at Dixon, and informed him about the conversation.

Wagers met with defendant again and asked defendant for information about Shamoon. Later that day, defendant handed Wagers an envelope containing addresses where Shamoon might be found. Included in the envelope was a photograph of defendant's daughter. Wagers testified that defendant gave him the photograph because defendant knew how Wagers' "people" were reckless when it came to drive-by shootings. Defendant "didn't want his daughter hit." After Wagers received this information, defendant said, "I want the son-of-a-bitch sand nigger dead."

On cross-examination, defense counsel impeached Wagers with his criminal record. Also, Wagers denied telling investigators of the Cook County public defender's office that he never had a conversation with defendant regarding performing a "hit" on Shamoon or that he did not know anyone who performs "hits."

Jerry Sternes testified that he is an investigator at Dixon. Wagers informed him that defendant wanted a civilian killed. Wagers gave Sternes the documentation which defendant provided for Wagers. One piece of paper contained a list of people named Shamoon and the addresses and telephone numbers of those people. Sternes confiscated a similar document from defendant's cell after defendant was arrested for the instant charges. Another piece of paper contained the name of one of the arcades that Danny Shamoon's family owned. The third piece of paper contained a photocopied photograph of a young woman. In response to Wagers' statements, Sternes initiated an investigation.

Randall Jordan testified that, in 1989, he was a special agent for the Illinois State Police. His supervisor assigned him to the investigation of defendant. This investigation entailed Jordan posing as Wagers' brother. On May 12, 1989, Jordan obtained an eavesdropping order from a Lee County judge. Defendant was the target of the eavesdrop. Jordan tape-recorded three conversations he had with defendant. All of the recordings were entered into evidence and played in open court.

On May 16, Jordan entered Dixon wearing an electronic surveillance device. He proceeded to the visitors' center, where he met defendant. A transcript of the conversation was made from the recording and was entered into evidence. During the conversation, defendant explained to Jordan why he was upset that his daughter was planning to marry Shamoon. During this explanation, defendant stated "he's just got to go. I wouldn't give a f— *** if he spends six months in the hospital."

When defendant finished his story, Jordan asked, "All right. What do you want from me?" Defendant replied:

"Just *** deal out justice. Your justice will be my justice. Put the fear of God in him, put him in the hospital, break his legs, whatever you do is just. Your justice will be my justice. If you gotta make him see his maker, so be it. So be it, as he has put a thorn in my side, so shall I be a thorn in his side."

Later in the conversation, the following colloquy ensued:

"JL [Defendant]: I mean that's just basically it, you know, that *** he's got her so intertwined that she can't see two inches in front of her. Maybe if he has an accident, maybe she'll see the

light. Maybe he'll see the light and stay with his own, and go look for his own. ***

RJ [Jordan]: What if he comes up dead?

JL: That's too bad. Think I'll say a prayer for him in my sleep.

RJ: You're willing to live with that?

JL: And then some. I read the paper every day. (Inaudible) too bad. Its too bad.

\* \* \*

RJ: The only thing I'm concerned about is what happens if, as a result of this situation, that he comes up dead. That's not going to bother you?

JL: No. No. I'll shed a tear for, for—

RJ: Yea, I see you got a couple up there.

JL: Yea. I will shed a tear. I'll probably go to bed that night and kneel and say well, he was a good ole' boy, but the city's loaded with dangerous people. It's a shame.

\* \* \*

RJ: And if you mail me a thousand dollars and instructions on how to get the other fifteen hundred after it's done, he comes up dead as a result, you're happy with that?

JL: Oh yea. I'll *** even be happy *** if he goes through a severe, serious beating.

RJ: What I'm saying though is what if it gets too far—

JL: Yea, well—

RJ: And it, and he dies?

JL: Then I'll shed a tear. Point blank, I'll shed a tear."

On May 25, 1989, Jordan petitioned the court for "an extension of the order authorizing the use of an eavesdropping device in order to clarify John Latona's request." After obtaining the extension, Jordan returned to Dixon on June 1, 1989, to have another conversation with defendant. The transcript of this recorded conversation was also entered into evidence. Defendant asked Jordan if he had received the letter that defendant had mailed to him. Jordan replied that he had not received it. Defendant gave him a copy of this letter. This letter, dated May 25, 1989, was entered into evidence. In it, defendant stated, among other things, "Maybe, if this 'minority' would experience a slight 'hospital stay'...maybe his mind might fall into place somewhat correctly and my daughter's veil will be lifted from her eyes...that this ARAB has now placed over *** her."

The following exchange took place between Jordan and defendant on June 1, 1989:

"RJ: And uh, you want the guy broke up, or do you want him wasted, eliminated, and out of your life?

JL: I want him in the hospital, just put him in the hospital, so he's laying [sic] in that bed just thinking, but *** if your justice is extreme, then so be it.

RJ: Well the thing is, if you want him broke up, we can't do it, because, and the reason is, is I was assuming that we wouldn't have no problems, all right?

JL: Yea.

RJ: And what it is, is my brothers got back to me and says there's people around this guy all the time.

\* \* \*

RJ: All right? So anyway, we don't need witnesses.

JL: Yea.

RJ: We don't need no witnesses at all.

JL: (Inaudible.)

RJ: So basically, you know if we were to do it, we'd have to hit him, and you know, eliminate him, and that's it, all right?

JL: Yea.

RJ: Cause if all you want is you want him broke up, I don't know what to tell you.

JL: Yea, well...

RJ: But we don't want to take the chance.

JL: All right, when they take him out then, I'll shed a tear.

RJ: You still want us to do it?

JL: Yes."

Later in the conversation, the following exchange occurred:

"JL: Once I get behind these walls, you'd be surprised what I can do. \*\*\* [O]nce I get outside those gates, the iron will come back again in my legs. I'll be able to walk. I can talk to myself, I can (inaudible) my own (inaudible). I can do my own (inaudible). There won't be no one to do my (inaudible) for me. Do you understand what I'm talking about?

RJ: In other words, \*\*\* if you had the opportunity, you'd do Danny rather than have someone else do it.

JL: If I was out right now, there'd be no Danny."

Jordan eventually received the letter defendant had mailed to him. Included with the letter were pieces of paper identical to those that defendant gave Wagers regarding Sheila, Shamoon, and where Shamoon could be found. Defendant called Jordan on June 21, 1989. The transcript of this recorded conversation was entered into evidence. During that conversation, the following exchange occurred:

"RJ: Well, I look for Danny to be in the, sort of in the hospital here shortly.

JL: Hmmm. Yea.

RJ: He's got something he's coming down with. Apparently it's terminal, whatever it is, and they don't expect it to be too long before he, he goes."

JL: It's a shame."

Sheila Latona testified that she visited defendant in prison in the summer of 1988. She and defendant discussed Sheila's engagement to Shamoon. During that conversation, defendant told Sheila that, if he had to, he and his Ku Klux Klan buddies would take Shamoon out to lunch, a lunch that he would not be able to chew or swallow.

Mort Smith, an investigator for the Cook County public defender's office, testified on defendant's behalf. He and his colleague, Ralph Metz, interviewed Wagers on May 7, 1992. During this interview, Wagers stated that he never had a conversation with defendant about performing a "hit" on Shamoon. When Smith and Metz confronted Wagers with his prior statements to law enforcement officers, Wagers explained that he lied because defendant had attacked him. As a result of the attack, Wagers was placed into protective custody. Wagers denied knowing anyone who does "hits." Metz's testimony corroborated that of Smith.

Defense counsel asked the trial court to consider finding defendant guilty of solicitation of aggravated battery, and the court stated that it would consider that option. The court found defendant guilty of solicitation of murder.

The trial court found that, because defendant recently completed a sentence for a 1981 murder conviction, he was eligible to receive an extended-term sentence. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(b)(1) (now 730 ILCS 5/5—5—3.2(b)(1) (West 1992)).) The trial court considered as an aggravating factor that defendant's conduct threatened serious harm. The court also found in aggravation that defendant has a history of criminal activity, the sentence was necessary to deter others from committing the same crime, defendant committed the offense against Shamoon because of Shamoon's national origin, and defendant showed no remorse for having committed the offense. The court found that there were no mitigating factors present and sentenced defendant to an extended term of 40 years' imprisonment.

Defendant moved for a new trial and for reconsideration of the sentence. In response to defendant's argument that the trial court improperly considered that defendant's conduct threatened serious harm, the court noted the general rule that a sentencing court may not consider in aggravation a factor that is implicit in the offense. The court then stated:

"[T]he Court also made note of the fact in its opinion as to the statements that were made by the defendant. *** For example, the statements that if he had to he and his Klu [sic] Klux Klan buddy would take [Shamoon] out to lunch, a lunch that he couldn't chew or swallow. The statements as to his wanting to hurt Danny

and the manner in which it would be done. So, I believe that there is sufficient evidence in the record to substantiate that point." The trial court denied defendant's motions, and this timely appeal followed.

Defendant first asks this court to reduce his conviction of solicitation of murder to solicitation of aggravated battery. (See 134 Ill. 2d R. 615(b)(3).) Defendant claims the evidence demonstrates he intended to solicit only an aggravated battery against Shamoon and that he was entrapped into committing solicitation of murder.

■ "A person commits solicitation of murder when, with the intent that the offense of first degree murder be committed, he commands, encourages or requests another to commit that offense." (Ill. Rev. Stat. 1989, ch. 38, par. 8—1.1 (now 720 ILCS 5/8—1.1 (West 1992)).) Entrapment is an affirmative defense. Under this defense, "[a] person is not guilty of an offense if his conduct is incited or induced by a public officer *** for the purpose of obtaining evidence for the prosecution of such person." (Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992)).) However, the defense does not apply "if a public officer *** merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992)).

The entrapment defense is raised when either the State's evidence raises the issue of entrapment or the defendant presents some evidence relating to the entrapment defense. (Ill. Rev. Stat. 1989, ch. 38, par. 3—2(a) (now 720 ILCS 5/3—2(a) (West 1992)).) Once the defense has been raised, the State must prove beyond a reasonable doubt that the defendant was not entrapped. *People v. Colano* (1992), 231 Ill. App. 3d 345, 348.

When reviewing a claim that the State failed to prove that the defendant was not entrapped, the relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. (*People v. Lambrecht* (1992), 231 Ill. App. 3d 426, 434.) The question of entrapment is one for the trier of fact unless the reviewing court can find entrapment as a matter of law. (*Colano*, 231 Ill. App. 3d at 349.) In order to sustain its burden of proving that defendant was not entrapped, the State needed to show that defendant was predisposed to commit the offense, *i.e.*, he was ready and willing to commit it without persuasion. (*Lambrecht*, 231 Ill. App. 3d at 435.) Here, the State had to prove that the criminal purpose of soliciting murder, as opposed to merely aggravated battery, originated with defendant. *People v. Landwer* (1993), 254 Ill. App. 3d 120, 129, *appeal allowed* (1994), 155 Ill. 2d 570.

Defendant contends he was not predisposed to solicit the murder of Shamoon. He claims that, while his initial conversation with Jordan demonstrates that he would not be sorry if Shamoon died as a result of the planned beating, there is nothing to indicate a clear intention for a first-degree murder to take place. According to defendant, it was not until Jordan insisted that Shamoon must be killed that defendant intended that a first-degree murder be committed.

During the initial conversation between Jordan and defendant on May 16, 1989, it appeared that defendant wanted to teach Shamoon a lesson and intended that he suffer a serious beating, but would have been content if Shamoon died as a result of that beating. On June 1, Jordan stated that he was concerned about leaving witnesses and could not help defendant if defendant merely wanted Shamoon "broke up." Defendant then agreed that the best course of action was to have Shamoon killed.

Solicitation of murder is a specific intent crime. (*People v. Hairston* (1970), 46 Ill. 2d 348, 357; 720 ILCS Ann. 5/8—1, Committee Comments—1961, at 408 (Smith-Hurd 1993).) Therefore, it is not sufficient that defendant solicited the commission of an act knowing "that such act[ ] create[d] a strong probability of death or great bodily harm" (see Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2) (now 720 ILCS 5/9—1(a)(2) (West 1992))) to Shamoon. (*People v. Trinkle* (1977), 68 Ill. 2d 198, 201.) Instead, defendant must act with the specific intent that a first-degree murder be committed. Defendant formed the specific intent to solicit murder after Jordan suggested on June 1 that they not leave any loose ends. The issue is, therefore, whether this act of soliciting murder was incited or induced by Jordan or whether defendant was predisposed to commit the offense.

Entrapment as a matter of law is not established where there is any substantial evidence from which it may be inferred that the criminal intent to commit a particular offense originated in the mind of the accused. (*People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 775.) The intent to commit the offense of solicitation is a state of mind which may be inferred from the surrounding circumstances because every sane person is presumed to intend the natural and probable consequences of his actions. (*People v. Barnett* (1988), 173 Ill. App. 3d 477, 483.) Generally, predisposition is established by a defendant's willingness to participate in criminal activity before his initial exposure to government agents. (*D'Angelo*, 223 Ill. App. 3d at 775-76.) Here, there was sufficient evidence to allow the trier of fact to conclude that defendant was predisposed to commit the offense.

■ Defendant initiated the sequence of events by telling Wagers that he'd "sure like to get that sand nigger killed." Defendant

welcomed Wagers' suggestion that Wagers arrange for one of his brothers to kill Shamoon. Defendant also took steps to ensure that his daughter would not accidentally be "hit" in a drive-by shooting. Wagers testified that defendant unequivocally told him that he wanted Shamoon dead. The trial court heard defendant's arguments that Wagers was a highly unbelievable witness. In rendering its decision, however, it stated that it chose to believe Wagers' testimony because it was corroborated in several respects by Sternes' testimony. When reviewing whether the evidence was sufficient to convict the defendant beyond a reasonable doubt, a reviewing court must not substitute its judgment for that of the trier of fact with regard to the credibility of the witnesses or the weight to be given their testimony. *Lambrecht*, 231 Ill. App. 3d at 434.

In addition to Wagers' testimony, the trial court heard evidence of defendant's indifference as to whether Shamoon died as a result of the beating he would receive. When Jordan suggested that Shamoon be killed, defendant expressed an overwhelming willingness to bring about that result. At no point in his conversations with Jordan did defendant express reluctance about having Shamoon killed. Towards the end of the June 1 conversation, defendant stated that, if he was not currently incarcerated, there would be no Danny Shamoon.

Entrapment does not occur when the government merely facilitates or affords opportunities for an individual to commit an offense. (*Lambrecht*, 231 Ill. App. 3d at 434.) All of the above-mentioned evidence, taken together, was sufficient to allow the trier of fact to conclude that defendant was predisposed to commit solicitation of murder and that Jordan merely afforded him an opportunity to commit that offense. Therefore, the evidence was sufficient to prove beyond a reasonable doubt that defendant was not entrapped into committing solicitation of murder.

The final two arguments that defendant raises address his sentence. He first claims that the trial court was without authority to impose an extended-term sentence under section 5—8—2(a)(2) of the Unified Code of Corrections. Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—2(a)(2) (now 730 ILCS 5/5—8—2(a)(2) (West 1992)).

Defendant raised this argument during the sentencing hearing but failed to raise it in his motion to reconsider. The State claims that defendant has waived this argument. However, this court has held that the imposition of an extended-term sentence is reviewable as plain error. (*People v. Lindsay* (1993), 247 Ill. App. 3d 518, 527.) Moreover, where, as here, the defendant claims that the sentence is void because the trial court did not have the authority to impose it, such an argument may be raised for the first time on appeal. (*People*

*v. Jones* (1988), 176 Ill. App. 3d 460, 465.) Therefore, we will consider the merits of this issue.

The primary rule of statutory construction is to ascertain and give effect to the true intent of the legislature. To determine the legislative intent, a court should first consider the statutory language, and, where the language is clear, it will be given effect without resort to other aids for construction. (*People ex rel. Baker v. Cowlin* (1992), 154 Ill. 2d 193, 197.) The issue defendant raises turns on the construction of the extended-term sentence provisions and the sentencing provision of the solicitation of murder statute. Both statutes address sentencing matters. When two statutes address the same subject matter, they are to be construed together. *People v. 1946 Buick, VIN 34423520* (1989), 127 Ill. 2d 374, 376.

■ Section 5—8—2(a) states that a judge may impose a term of imprisonment greater than that authorized by section 5—8—1 if certain enumerated aggravating factors are present. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—2(a) (now 730 ILCS 5/5—8—2(a) (West 1992)).) Section 5—8—1(a) prescribes the sentencing ranges for the various classes of felonies. (See Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a) (now codified, as amended, at 730 ILCS 5/5—8—1(a) (West 1992)).) Section 5—8—1(a)(3) states that "except as otherwise provided in the statute defining the offense," the sentence for a Class X felony is 6 to 30 years' imprisonment. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(3) (now 730 ILCS 5/5—8—1(a)(3) (West 1992)).) However, the solicitation of murder statute states that this offense is a Class X felony punishable by 15 to 30 years' imprisonment. Ill. Rev. Stat. 1989, ch. 38, par. 8—1.1(b) (now 720 ILCS 5/8—1.1(b) (West 1992)).

Defendant argues that, because the legislature has already prescribed a more severe penalty for solicitation of murder and because section 5—8—2 makes no reference to any sentencing scheme other than that contained in section 5—8—1(a), the legislature intended that people convicted of solicitation of murder not be sentenced to an extended term of imprisonment. We disagree. By inserting into section 5—8—1(a)(3) the language "except as otherwise provided in the statute defining the offense," the legislature incorporated by reference all those provisions which prescribe a modified Class X sentencing scheme for the offenses they define. Therefore, section 5—8—1 does indirectly authorize the sentence for solicitation of murder. Because it does, a trial court may sentence a person convicted of that offense to an extended term of imprisonment when any of the enumerated aggravating factors are present.

To adopt defendant's interpretation of these provisions would leave an entire range of serious felonies outside the scope of the

extended-term sentencing provisions. We must presume that the legislature did not intend such an absurd result. *People v. Bole* (1993), 155 Ill. 2d 188, 195.

We also note that defendant's interpretation raises problems regarding unconstitutionally disproportionate penalties. Under article I, sections 2 and 11, of the Illinois Constitution, the penalty imposed for an offense must be proportionate to the seriousness of the offense. (Ill. Const. 1970, art. I, §§ 2, 11; *People v. Wisslead* (1983), 94 Ill. 2d 190, 196.) The policy underlying these provisions would be violated if the penalty prescribed for an offense is not as great or greater than the penalty prescribed for a less serious offense. (*Wisslead*, 94 Ill. 2d at 196.) Because the legislature prescribed more severe penalties for offenses such as solicitation of murder and solicitation of murder for hire (see Ill. Rev. Stat. 1989, ch. 38, pars. 8—1.1(b), 8—1.2(b) (now 720 ILCS 5/8—1.1(b), 8—1.2(b) (West 1992))), the legislature apparently considered these to be more serious offenses than other Class X offenses. However, under defendant's interpretation, a person convicted of a simple Class X felony could be sentenced to up to 60 years' imprisonment if certain aggravating factors are present (see Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—2(a)(2) (now 730 ILCS 5/5—8—2(a)(2) (West 1992))), while a person convicted of solicitation of murder or solicitation of murder for hire could not, even if the same aggravating factors were present. Defendant's interpretation gives rise to the anomalous situation of a less serious offense carrying a more severe penalty than more serious offenses, and we decline to accept such an interpretation.

Defendant's final claim is that the trial court improperly considered as an aggravating factor that his conduct threatened serious harm. Generally, a sentencing court may consider as a justification for imposing a more severe sentence that the offender's conduct caused or threatened serious harm. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(1) (now 730 ILCS 5/5—5—3.2(a)(1) (West 1992)).) However, it is well settled that a factor which is implicit in the offense of which defendant was convicted should not be considered at sentencing as an aggravating factor. (*People v. Conover* (1981), 84 Ill. 2d 400, 404.) Defendant correctly notes that the threat of serious harm is implicit in the offense of solicitation of murder because, by definition, every solicitation of murder threatens serious harm. See, *e.g., People v. Gonzalez* (1993), 243 Ill. App. 3d 238, 245 (trial court improperly considered that defendant's conduct threatened serious harm because that fact is implicit in the offense of aggravated arson).

It is also well settled, however, that the commission of any offense has varying degrees of harm or threatened harm, and this variance

constitutes an aggravating factor even where serious bodily harm is implicit in the offense. (*People v. Robinson* (1993), 250 Ill. App. 3d 824, 833.) The State claims that the trial court's comments at the hearing on the motion to reconsider reveal that it did not merely consider the threat of serious harm. Instead, the court was influenced by its observation that defendant wanted Shamoon to suffer intensely before he died. Therefore, according to the State, the court properly considered the degree of harm threatened.

When an offense involving the death of the victim is at issue, the sentencing court may consider the nature and extent of the force employed and the physical manner in which the offender caused the victim's death. (*People v. Allan* (1992), 231 Ill. App. 3d 447, 458.) Nevertheless, the court may not focus on the end result of the harm, the death of the victim. (*Allan*, 231 Ill. App. 3d at 458-59.) Similarly, when the threat of death is implicit in the offense, the court may consider the intended manner in which the death will be brought about but may not consider merely the threat of death.

Here, the trial court focused only on the type of beating that defendant wanted Jordan to inflict upon Shamoon. However, this was defendant's plan before defendant and Jordan agreed that Shamoon should be killed. After they agreed to have Shamoon killed, there was no discussion regarding the manner in which Shamoon was to be killed. Therefore, the only factor that the trial court could have relied on was the threat of death. This was improper.

■ If it can be determined from the record that the weight the trial court placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, a remand for a new sentencing hearing is not required. (*People v. White* (1986), 114 Ill. 2d 61, 67-68; *People v. Kendall* (1991), 213 Ill. App. 3d 782, 789.) Here, the trial court did not merely mention in passing that defendant's conduct threatened serious harm. Instead it appeared to give this factor the same weight as the other factors it listed in aggravation. Because we cannot conclude that the weight the trial court placed on this improper factor was insignificant, we must remand this cause for a new sentencing hearing.

Based on all of the foregoing, we affirm the defendant's conviction of solicitation of murder but vacate the sentence and remand the cause for a new sentencing hearing. As stated above, the trial court is not precluded from imposing an extended-term sentence.

Affirmed in part; vacated in part and remanded.

INGLIS, P.J., and BOWMAN, J., concur.