THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MARK A. LAMBRECHT, Defendant-Appellant.

Second District   No. 2—90—0449

Opinion filed July 9, 1992.

G. Joseph Weller, Barbara R. Paschen, and Kathleen J. Hamill, all of State Appellate Defender's Office, of Elgin, for appellant.

Dennis Schumacher, State's Attorney, of Oregon (William L. Browers, John X. Breslin, and Judith Z. Kelly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

A jury convicted defendant, Mark A. Lambrecht, of one count of unlawful delivery of 15 or more grams of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)), two counts of unlawful delivery of more than one but not more than 15 grams of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(b)(2)), and one count of unlawful possession of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1402(b)). He was sentenced to serve concurrent terms of one, four, four and six years in prison for his offenses. Defendant presented an entrapment defense and asserts on appeal that (1) the State failed to prove beyond a reasonable doubt that he was not entrapped, (2) the trial court erred in excluding his expert witness' opinion regarding his ability to commit the charged offenses, and (3) the trial court improperly questioned his expert witness.

In July 1988 police officer Ronald Vandergrift, a member of a five-county drug task force, started working with Nancy Smith, a confidential informant. Smith had been arrested the previous May on two felony counts of unlawful delivery of cannabis. However, she had reached an agreement with the State whereby the charges against her would be dismissed in return for her cooperation in setting up a cocaine buy. She was to provide information which would lead to the undercover purchase of two ounces of cocaine from a dealer in the area. A record of this agreement had been made in open court on June 14, 1988. The transcript of that proceeding was read to defendant's jury. The charges against Smith were dismissed a few days after the defendant was arrested.

During June, Smith approached defendant about helping her to get some cocaine. On July 1 defendant telephoned Smith. She arranged to meet defendant later that day at a restaurant parking lot in Byron to buy a quarter ounce of cocaine. Vandergrift, who had no previous connection or contact with the defendant, drove Smith to the parking lot. Defendant, who was already there, walked to the passenger side of Vandergrift's car and dropped a plastic bag of cocaine through the open window into Smith's lap. Officer Vandergrift, who had also walked around to the passenger side of the car, testified that he heard defendant say something to the effect of "this is the best stuff you'll ever have." When Vandergrift asked if the bag contained a full quarter ounce, the defendant replied that he did not know because he had not weighed it himself. Vandergrift took the plastic bag from Smith and paid the defendant $500. The defendant told the officer that he was not making any money on the deal.

Vandergrift testified that he next arranged to buy an ounce of cocaine from defendant on July 3. Although that delivery did not work out, defendant gave Vandergrift his phone number, and, on July 6, Officer Vandergrift called defendant at his home in Wisconsin. At first, Vandergrift complained that the substance he had received on July 1 had been a gram short. The witness explained that he did this to let defendant know that he was weighing what he was getting and expected to get what he paid for. He then arranged to buy one ounce of cocaine from the defendant on July 8. On July 7, according to Vandergrift, he called the defendant four times, and defendant called Nancy Smith's home three times regarding the deal.

On the evening of July 8, Officer Vandergrift and Smith again met defendant in the restaurant parking lot. This time defendant opened the hood of his car and placed a bag of cocaine on the car radiator. Vandergrift picked it up, but defendant reported that he had

only been able to get a half ounce. Officer Vandergrift paid defendant $800, and defendant then showed him some white powder on the owner's manual of his car and said, "[t]his is all I took, plus a couple lines that I did." Defendant indicated that the small amount of cocaine was all he was getting out of the deal. Vandergrift said he discussed with defendant the future purchase of an ounce of cocaine but made no definite arrangements. Although Nancy Smith denied it during her cross-examination, Vandergrift said that Smith later told him defendant had called her on July 9, 10 and 11, trying to set up the one-ounce sale.

Vandergrift next contacted the defendant on August 18. Between August 18 and August 26 defendant contacted Officer Vandergrift three times. On August 26 Vandergrift tape recorded three telephone calls he received from the defendant. The tape was played for the jury. All three calls were connected with the arrangements for Vandergrift to buy one ounce of cocaine that evening. Defendant indicated that he had to stop at Maria's to pick up the drugs and would meet Officer Vandergrift later. At one point defendant phoned Vandergrift to tell him he was on his way to Maria's. He said he wanted to let him know "what's going on instead of you getting nervous, or anything."

Upon arriving at the Byron parking lot, Vandergrift, who was alone this time and wearing an eavesdropping device, got into defendant's car. At defendant's direction he found two bags of cocaine in a container between the front seats. The defendant also showed Vandergrift a small amount of cocaine, which he referred to as "[t]wo rocks." Defendant said one "rock" had been taken from each of the two bags the officer had found between the seats and explained that that was what he got for delivering the drugs. A short time later defendant commented that it was nice to see "Ron" and added, "I thought you gave up on me, or you got some other source, or something." He then explained that his wife knew what was going on and, for doing what they were doing, his wife got $100 and he got the cocaine he took out of the bags he delivered. When Vandergrift asked him what was in the two bags, defendant replied, "[t]oot. Toot-toot, the best toot." After Vandergrift paid him $2,900 the defendant was arrested. The tape Vandergrift had been wearing during the drug buy was played for the jury.

In March 1989, some six months after the charges against her were dropped, Nancy Smith signed a statement in which she indicated that defendant never would have done what he did if she had not contacted him and pushed him into it. At trial she testified for defendant.

Smith worked at the Kopy Kat restaurant in Oregon and knew defendant because he delivered food to the restaurant from a Wisconsin supplier. She decided to involve him in the setup because she thought he was naive and easy to fool. Too, because defendant was not from the Oregon area, she figured her friends would not find out that she had set someone up. Smith also had heard rumors that the defendant had made cocaine deliveries to the Kopper Kettle, another restaurant in Oregon, and had sold cocaine to Wayne Messenger at the Kopper Kettle. She knew, too, that defendant had recently worked with Martin Viveros, and Viveros had talked to her and others about selling and using drugs. Smith testified that defendant had not talked about selling drugs to her. Rather, when he came to the Kopy Kat to make deliveries, she approached him and told him she was in trouble and needed a lot of money. She asked him to help her buy cocaine so she could sell it to make the money she needed. Smith said she did not give defendant her phone number but did ask for his.

On cross-examination Smith conceded that she had voluntarily entered into the agreement with the State whereby her charges were dismissed and that she had been represented by an attorney at the time. She also acknowledged that she had not initiated the March 1989 statement. Rather, she had been approached by an investigator for defendant's attorney. The investigator had come to the Kopy Kat, taken her oral statement, and returned a few days later with a typed statement for her to sign. Smith further admitted that she had never gone to the State's Attorney and told him how she felt about involving defendant.

Defendant testified on his own behalf. His wholesale food delivery route in Ogle County included, among other restaurants, the Kopy Kat in Oregon. Early in 1988, he trained Martin Viveros to take over the route. Viveros talked about drugs but, according to defendant, did not mention that he was charged with conspiracy to sell cocaine. In May 1988 defendant resumed the Ogle County route because Viveros had quit. Defendant had known Nancy Smith since 1986 when he began the route but had never talked to her about drugs.

Defendant's testimony was similar to Smith's regarding Smith's request for obtaining help in obtaining drugs. During an early June delivery at the Kopy Kat Smith came to him, appearing to be scared and in trouble, and said she needed cocaine because someone was after her to get the drug. Defendant said he told her he was not involved with drugs but offered to lend her money. Smith asked him to let her know if he ran across anybody, any place else in town, who might be willing to help her. She gave him her phone number so that,

if he found someone who could help, that person could call her or he could call her and let her know. On June 17, Smith again asked for defendant's help. Defendant testified that, when he told her he had no access to cocaine, Smith suggested that he contact Martin Viveros.

After June 17, Jody Schuman had taken over defendant's Ogle County route. On June 28 Schuman gave defendant the message that Smith wanted him to call her. That same day Smith phoned defendant. She sounded upset and again asked for his help. Defendant said that Smith made him feel bad for her. The next day, June 29, while in Ogle County, defendant telephoned Viveros, hoping that he would deal directly with Smith. Viveros referred him to Maria, the woman he lived with, who agreed to sell defendant the cocaine.

On July 1 defendant and a friend of his, Lee Kruse, drove to Maria's home in Rockford. Defendant knew where she lived from having worked with Viveros. Defendant called Smith from Maria's phone and made arrangements to deliver one-quarter ounce of cocaine to her. Defendant's account of the sale in the restaurant parking lot was similar in most respects to that of Vandergrift. However, defendant added that the man with Smith, whom he came to know as "Ron," was big, heavyset, bearded and dressed in a jeans jacket, biker boots, and sunglasses. The man poked him in the chest and, in a threatening manner, said that one sale would not settle matters between himself and Smith, that defendant would have to deliver more drugs to him. Defendant's offer to put "Ron" in touch with Maria was refused. After "Ron" paid defendant $500, defendant and Kruse drove to Maria's, gave her the money, and returned to Wisconsin. Defendant's description of "Ron's" demeanor and conduct was essentially corroborated by Kruse.

Defendant further testified that "Ron" called him on July 2 and 3, demanding to buy one ounce of cocaine. When he asserted that he could not come up with the drugs, "Ron" threatened him. On July 6 "Ron" called a total of five times, still seeking an ounce of cocaine. Defendant at first refused, but, becoming tired and fearful for himself and Smith, he agreed to a July 8 delivery.

On July 8 defendant picked up a premeasured bag from Maria. He delivered it to "Ron" who claimed it did not contain a full ounce and ordered defendant to go back and get the other half ounce. Defendant refused and told "Ron" and Smith he would not deliver again. He took the $800 "Ron" paid him back to Maria. Defendant testified that he neither kept nor received money for the July 1 or 8 deliveries. Nor did he take any cocaine from the bags he delivered to "Ron."

On August 18, according to defendant, "Ron" phoned, seeking two ounces of cocaine, and threatened him if he did not cooperate. "Ron" called again on August 22 and 23 and began threatening defendant's family. After defendant agreed to meet him on August 26, "Ron" encouraged defendant to take some cocaine out of the bag for himself.

On the evening of August 26 defendant picked up two bags of cocaine from Maria. When he informed Maria that "Ron" had told him to take some out for himself, she gave him two folded paper packets containing cocaine. Defendant testified that he later met "Ron" and, out of fear, acted like "Ron's" friend and tried to impress him. The sale took place and defendant was arrested.

Defendant was taken to the police station where, upon learning the possible sentence for the charges against him, he cried. Defendant testified, in essence, that after being coerced and threatened by various officers, and bribed by the prospect of a reduced sentence, he agreed to cooperate with police. At first he admitted only to the July 1 and 8 deliveries to Vandergrift. Then, according to his testimony, believing he had to admit to other crimes, he told Rockford police about Maria and lied that he had delivered cocaine to Gilbert Gonzales. Officer Versetti from Rockford affirmed that defendant was shaken and had been crying just before he spoke to him.

Defendant then agreed to make a statement on videotape. However, defendant testified that, before making the tape, Sergeant Kerns of the Illinois State Police had prepared him to answer the questions which would be asked. He said that, at Kerns' request, he had lied on the tape when he said he had profited from the deliveries.

Dr. Joseph Vaughn, a clinical psychologist, also testified for defendant. Dr. Vaughn had interviewed and administered intelligence and personality assessment tests to defendant. In essence, the doctor indicated that defendant had a below average I.Q., was excessively dependent on other people, and possessed very poor social judgment in that he followed others rather than making decisions for himself. He found no signs of drug abuse or anti-social tendencies.

In rebuttal the State played the videotape of defendant's statement made on the night he was arrested. On the tape defendant claimed to have made $100 from the cocaine sale on July 1 and $150 on July 8. He added that he would have made $200 on August 26 if the deal had been completed. On each occasion he had obtained the drug from Maria. Defendant also said that he had taken a small amount of cocaine out of the bags for his personal use on each of the three occasions. He stated that, prior to the deliveries to "Ron," he had once delivered cocaine, which he obtained from Maria, to Gilbert

Gonzales in Wisconsin. He made no profit that time because Gonzales had given him marijuana when he first started smoking it. On another earlier occasion he had delivered cocaine he got in Wisconsin to Wayne at the Kopper Kettle in Oregon. He also had given marijuana to a couple of kids at the Silo Supper Club. In discussing the first sale to "Ron" defendant described how Nancy Smith had come to him and asked for help. He recounted his answer to her as follows:

"I didn't know for sure, and I said, I don't know, may be [*sic*], probably, I don't know, and then she said, I'll get a hold of you, she gave me a telephone number and after a month or so went by, she gave me a call and said she wanted some, and so I went and talked to Maria."

Defendant indicated that his motive for selling the drugs was the money and the small amount of cocaine he took for personal use.

At trial defendant presented a defense of entrapment. The jury, however, found him guilty on all counts, and his motions for a new trial were denied. After he was sentenced, defendant timely filed this appeal.

Defendant first contends that the State failed to carry its burden with regard to his entrapment defense. Illinois provides for such a defense in section 7—12 of the Criminal Code of 1961 as follows:

"A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1987, ch. 38, par. 7—12.)

Once a defendant presents some evidence to raise the issue of entrapment, the burden is on the State to prove beyond a reasonable doubt that defendant was not entrapped. (*People v. Tipton* (1980), 78 Ill. 2d 477, 487; *People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 773-74.) While the State does not dispute that defendant raised an entrapment defense, it vigorously contests defendant's assertion that it failed to prove that no entrapment occurred.

As a preliminary matter, the parties disagree as to the standard to be applied to appellate review of an entrapment defense. Defendant cites *People v. Husted* (1981), 97 Ill. App. 3d 160, for the proposition that the reviewing court is to consider all of the defendant's testimony regarding entrapment in the light most favorable to him. *Husted*, in turn, cites to *People v. Carpentier* (1974), 20 Ill. App. 3d

1024, where this rule originated. However, *Carpentier* dealt with the question of whether the defendant was entitled to a jury instruction on the defense of entrapment. The court stated that, in deciding this limited issue, the defendant's evidence in support of entrapment must be viewed in the light most favorable to the defendant. *Carpentier* did not establish that this standard of review applies to the determination of whether the State has sustained its burden of proof on entrapment. The clarification we make here regarding the standard employed in *Carpentier* was also made by the courts in *People v. Poulos* (1990), 196 Ill. App. 3d 653, 657-58, and *People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 773-74. We agree with the *Poulos* and *D'Angelo* courts that later cases evidently picked up on the language in *Carpentier*, out of context, and misstated the standard for reviewing the sufficiency of the State's evidence against the entrapment defense. See *People v. Connor* (1988), 176 Ill. App. 3d 900, 905; *People v. Johnson* (1984), 123 Ill. App. 3d 363, 370; *Husted*, 97 Ill. App. 3d at 171.

The question of whether a defendant has been unlawfully entrapped is generally a factual question to be resolved by the trier of fact. (*Tipton*, 78 Ill. 2d at 487; *People v. Norks* (1985), 137 Ill. App. 3d 1078, 1082-83.) A reviewing court may not substitute its judgment for that of a jury with regard to the weight of the evidence or the credibility of the witnesses and should not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 375; *Norks*, 137 Ill. App. 3d at 1083.) Thus, the relevant inquiry is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements essential to the criminal conviction beyond a reasonable doubt. (*Campbell*, 146 Ill. 2d at 374; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) When the evidence is viewed under this standard, reversal is not warranted.

■■ ■ To support a finding of entrapment the evidence must disclose improper inducement by the State and a lack of predisposition to commit the crime on the defendant's part. (*D'Angelo*, 223 Ill. App. 3d at 774-75; *People v. Schillaci* (1988), 171 Ill. App. 3d 510, 517.) A defendant's predisposition to commit an offense is a crucial element in overcoming an entrapment defense. (*People v. Cross* (1979), 77 Ill. 2d 396, 405; *Schillaci*, 171 Ill. App. 3d at 517.) Entrapment does not occur when the government merely facilitates or affords opportunities for an individual to commit an offense. (*Cross*, 77 Ill. 2d at 404; *Poulos*, 196 Ill. App. 3d at 658.) In sum, in order to sustain its burden of proving that defendant was not entrapped, the State needed to

show that defendant was ready and willing to commit the crime without persuasion, that is, that he was predisposed to commit it. *D'Angelo*, 223 Ill. App. 3d at 775; *People v. Boalbey* (1986), 143 Ill. App. 3d 362, 364-65.

The courts have considered a number of factors when determining a defendant's predisposition to commit a crime: the defendant's initial reluctance or readiness to commit the offense; and, in drug offenses, the defendant's familiarity with drugs, his willingness to accommodate the drug user's needs and to make a profit from the illegal conduct, whether he has a ready source to supply the drugs, his own prior or current use of illegal drugs, and his participation in testing or cutting the drugs. (*D'Angelo*, 223 Ill. App. 3d at 776; *Poulos*, 196 Ill. App. 3d at 661.) It is significant also whether defendant was involved in a course of conduct involving similar offenses. (*People v. Beavers* (1986), 141 Ill. App. 3d 790, 795.) That defendant has no prior criminal record is a factor to be considered but, standing alone, is not enough to show entrapment. (*D'Angelo*, 223 Ill. App. 3d at 776; *People v. Andreano* (1978), 64 Ill. App. 3d 551, 557.) We are of the opinion that, based on the evidence presented to it, the jury could have found beyond a reasonable doubt that defendant was predisposed to commit the charged offenses.

While defendant testified to his initial great reluctance and, indeed, his refusal to procure cocaine for Nancy Smith, he himself indicated during his videotaped statement that, on the first occasion she asked for help, he had given Smith an equivocal answer. He told her he "didn't know for sure, may be [*sic*], probably, I don't know." He did not turn her down flat. Rather, he left the door open for her to ask again. The second time Smith approached defendant she suggested that he contact Martin Viveros. Defendant testified that he agreed to contact Martin even though he had no intention of doing so. While defendant did not take any action at that time, his failure to do so could have been explained by the fact that Smith's second request came on June 17, which happened to be defendant's last day on the Ogle County route. He did not deliver to the Kopy Kat again; he was working elsewhere. Yet, when Smith called him on June 28, it took him only one day to make the call, first to Martin and then to Maria. He also immediately reported back to Smith. Two days later he made the arrangements, picked up the cocaine from Maria, and delivered it to Smith and Vandergrift. On close examination, defendant's initial hesitance does not seem so great as he proclaimed it to be. His reluctance to get involved is further undercut by his familiarity with the street language of drugs, evidence that he had made prior deliveries

of cocaine, and evidence of his active involvement in the later sales to "Ron." The jury could have concluded that defendant's initial hesitance was due to the caution a drug trafficker might be expected to exercise in dealing with a new customer whom he had not yet come to trust.

That defendant was familiar with drugs and willing to profit from the illegal conduct is amply supported by the record. He used the vocabulary of the drug culture, referring to the cocaine as "toot" and "rocks" and "lines" that he himself used. He was knowledgeable about the amounts and weights of the cocaine in the bags, even though he said he did not weigh it or cut it himself. As for defendant's willingness to profit from his illegal conduct, in both the tape recording of his conversation with Vandergrift during the last drug transaction and his subsequent videotaped statement he indicated that he got both money and drugs for delivering cocaine. The jury could have believed this statement rather than his in-court testimony that he did not profit and that he lied on the tape. We note that there is no indication on either the videotape or the audio tape themselves that defendant was being coerced or threatened in any way.

Although, in his in-court testimony, defendant denied using cocaine and having a source to supply the drugs, the jury could have concluded from Vandergrift's testimony, as well as defendant's taped conversation with Vandergrift, that he was, indeed, a user and that he had been obtaining drugs from Maria prior to the deliveries to Smith. While defendant testified that on the occasion of the last delivery he was afraid of "Ron" and was merely trying to act friendly and say what he thought "Ron" wanted to hear, the audio tape of the conversation between defendant and "Ron" does not even hint at such a situation. To the contrary, defendant sounds relaxed and spontaneous. Without hesitation he told "Ron" about taking a small amount of cocaine out of the bags even though "Ron" had told him he did not like that.

Finally, the evidence was more than adequate to show that defendant was involved in a course of conduct involving similar offenses. He delivered, in increasing amounts, to Smith and/or "Ron" on three separate occasions. Further, he showed no hesitation in switching from Smith to "Ron" as his customer. Smith was heavily involved in the first transaction, but only minimally implicated in the second and not a party at all to the third. Too, Vandergrift testified that defendant gave him his home phone number, and, as reflected on the audio tape of the third buy, defendant inquired of "Ron" how often he was going to be needing cocaine. Finally, the videotape surely

showed defendant to be involved with the possession and delivery of cocaine on an ongoing, even if not frequent, basis.

Much of the State's evidence on entrapment or, more specifically, on the question of defendant's predisposition, was contested by defendant. Most notably, defendant's in-court testimony conflicted with his statements on both the eavesdrop tape of the final drug transaction and the videotaped statement he made after his arrest. However, where inconsistencies and conflicts exist in the evidence, it is the responsibility of the trier of fact to weigh the credibility of the witnesses and resolve the conflicts and inconsistencies. (*People v. Aguilar* (1991), 218 Ill. App. 3d 1, 8.) Here, we think the evidence favoring the State, if believed by the jury, was sufficient to prove beyond a reasonable doubt that defendant was predisposed to commit the charged offenses and, thus, was not entrapped.

We turn now to defendant's claims relative to psychologist Joseph Vaughn, his expert witness. Prior to trial the court granted the State's motion *in limine* to exclude Vaughn's opinion testimony as to whether the defendant had the capacity, on his own, to formulate a plan to deliver drugs. When defense counsel nevertheless asked this question during direct examination of Vaughn, the State's objection was sustained. Later, after the State completed its re-cross-examination of the witness, the trial judge directed a question to Dr. Vaughn and received an answer as follows:

"THE COURT: I just have one question. Nothing about Mike's—or whatever his name is, Lambrecht's psychological make up makes it difficult for him to know right from wrong, does it?

A. Mark understands right from wrong.

THE COURT: Okay, that's all."

Defendant posits that, since he called Dr. Vaughn only to support his defense theory of entrapment, the court's question raised an irrelevant point. Defendant argues that the court's refusal to allow Dr. Vaughn to give his opinion regarding the basis for the defense theory, coupled with the court's focus on an extraneous matter, resulted in an unfair trial.

The State counters that Dr. Vaughn's testimony was properly excluded because it would have given an opinion on the ultimate issue in the case even though such an opinion was not necessary to help the jury understand the facts. Therefore, according to the State, to have allowed Dr. Vaughn to answer the question would have invaded the province of the jury. With regard to defendant's attack on the question asked by the trial judge, the State urges that the question was

proper clarification of an issue raised by defendant during direct examination.

The State does not dispute defendant's contention that, generally, expert testimony is admissible to assist the trier of fact even though the testimony is an opinion on an ultimate issue in the case. (See *People v. Harris* (1989), 132 Ill. 2d 366, 385; *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 447.) The current general standard for the admissibility of expert testimony is whether it will aid the jury in understanding the facts. (*Anderson v. Chesapeake & Ohio Ry. Co.* (1986), 147 Ill. App. 3d 960, 975; *Batteast v. Wyeth Laboratories, Inc.* (1988), 172 Ill. App. 3d 114, 134.) Thus, expert testimony is admissible when the expert testifies to facts which require scientific knowledge beyond the common knowledge of ordinary lay people. (*People v. Masor* (1991), 218 Ill. App. 3d 884, 887; *People v. Ambro* (1987), 153 Ill. App. 3d 1, 8.) Conversely, expert opinions are not admissible on matters of common experience unless the subject matter is difficult to understand and explain. (*Ambro*, 153 Ill. App. 3d at 8.) The State argues that, in light of all the evidence that had been introduced, the jury was able to determine the question of defendant's predisposition on its own. In other words, the jury did not need the expert's opinion on the ultimate question in order to understand the facts. We agree.

■ It appears to us that Dr. Vaughn, a clinical psychologist with 20 years of experience, testified extensively regarding defendant's personality and general ability to act on his own and/or initiate activities or plans. On three different occasions the doctor had interviewed and/or given defendant various personality and intelligence tests. Dr. Vaughn indicated that defendant, who was 24 years old at the time of trial, had a below average I.Q., could read only at an eighth-grade level and do math at a twelfth-grade level, was deficient in figuring out how to deal with things that come up on a daily basis, and had a problem with abstract reasoning ability. The witness described defendant as suffering from a dependent personality disorder.

Dr. Vaughn testified repeatedly and in a number of different ways that, as part of his personality problems, defendant was insecure, had a strong need to please others in order to avoid rejection, was easily led by others, was likely to give into others' demands, and had great difficulty making decisions on his own and, in general, standing on his own two feet. Dr. Vaughn summarized his conclusions by describing defendant as "a young man whose intelligence is impaired, who does not have confidence in himself, who is anxious and insecure below the surface, although he puts on a front of everything is okay." Finally, on

redirect, the following exchange took place between the witness and defense counsel:

"Q. Is Mark Lambrecht the type of person who is a type of individual who will basically initiate a plan or scheme?

A. Based on his limited intelligence and personality profile, I would say this would be difficult for him.

\* \* \*

Q. [Is he a] person would have—who would have a difficult time formulating independent plans to engage in antisocial activities?

A. I would think that this would not be consistent with his profile, this is true."

It seems the *only* question Dr. Vaughn was not allowed to answer was the fact-specific question of whether he had an opinion "as to whether [defendant] could have been the type of person that would formulate a plan to become involved in some type of drug sale," which was asked by defense counsel.

We agree with the State that the jury had been presented with a great deal of evidence as to defendant's ability to make decisions and to act on those decisions. Consequently, we do not think the jurors needed the help of an expert opinion on the ultimate issue of whether defendant would initiate his own involvement in an unlawful drug sale. Dr. Vaughn's testimony, cumulatively, provided a sound base from which the jury, utilizing its common experience and knowledge, could draw its own inferences and conclusions. The jury was entitled to determine the weight to be given to the evidence of defendant's personality weaknesses and to balance that evidence against the evidence that he was predisposed to commit the crime. We believe the admission of the excluded expert opinion testimony would have invaded the province of the jury (*Ambro*, 153 Ill. App. 3d at 8) and, therefore, was properly excluded.

As for defendant's claim that the trial court improperly asked Dr. Vaughn whether defendant could distinguish right from wrong, we do not agree that the court raised an irrelevant issue. A trial judge has the discretion to question witnesses in order to elicit the truth or clarify obscure issues, and the propriety of such questioning depends on the facts of each case. *People v. Nevitt* (1990), 135 Ill. 2d 423, 456.

Dr. Vaughn testified in detail regarding the defendant's low I.Q. and limited abstract reasoning ability as well as his dependent personality disorder and lack of social judgment. At the conclusion of the doctor's testimony, the trial judge asked a single, final question about defendant's capacity to know right from wrong. Subsequently, during

his direct examination, defendant responded to counsel's questions as follows:

"Q. The July 1st and July 8th meetings, where you brought this white powder down to Nancy, did you think you had done anything wrong at that time?

A. No.

Q. Why not? Did you think you had violated the law when you had done this?

A. Not by helping someone out, I didn't think I was.

Q. What about up to the point where you had that—you had violated the law?

A. No.

Q. Were you violating the law?

A. No.

Q. Why not?

A. I don't know, I just didn't think that it was so bad to do that, I thought that if you just sold it out of your house, or if you were a person doing it out of your house, or something, that that was wrong, but I didn't think just driving it from one place to another was wrong."

Similarly, on cross-examination the following questions and answers were recorded:

"MRS. MINNIS [assistant State's Attorney]: Q. I believe you stated that yesterday you didn't think there was anything wrong with, I think you said taking cocaine from one person to another, like being the middle man, isn't that correct?

A. I didn't know it would be—what would be wrong with it, if I was ordered to do it.

Q. So you are, you knew it was illegal, you just didn't think it was wrong because you—Ron ordered you, is that your testimony?

A. Yes."

■ We agree with the trial judge that Dr. Vaughn's testimony as to defendant's limited capacity and doubtful psychological profile, coupled with defendant's own responses as to whether he thought his conduct was wrong or illegal, was more than adequate to suggest to the jury that defendant might not be able to discern right from wrong. We also agree that, absent the court's question to Dr. Vaughn, the impression left with the jury would not have been a fair one. Defendant raised the question of his ability to tell right from wrong and may not now complain merely because the jury was given a complete and balanced picture of the issue. In our opinion the trial court

exercised its discretion wisely in order to elicit the truth and clarify a subtle issue. (*Nevitt,* 135 Ill. 2d at 456.) Moreover, we note that the jury was instructed as follows:

> "Neither by these instructions, nor by any ruling or remark which I have made, do I mean to indicate any opinion as to the facts or as to what your verdict should be."

Any misapprehension of the court's question on the part of the jurors would have been mitigated by this instruction.

For all of the reasons set forth above, the order of the circuit court of Ogle County is affirmed.

Affirmed.

INGLIS, P.J., and NICKELS, J., concur.