FIFTH DIVISION

DECEMBER 10, 2004

No. 1-03-1126

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

)

v. ) No. 00 CR 8131 

)

SHARON VOIT, ) Honorable

) Garritt Howard,

Defendant-Appellant. ) Judge Presiding.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Sharon Voit was found guilty of solicitation of murder for hire and attempted first degree murder.  The trial court sentenced defendant to concurrent terms of 23 and 10 years in prison, respectively.  Defendant now appeals.

The record on appeal discloses the following facts.  Prior to trial, the State filed a motion 
in limine
 to exclude any expert testimony that defendant was vulnerable to influence and entrapment.  The trial court initially reserved ruling on that motion, but ultimately granted the motion prior to trial.

At trial, Robyn Poe testified that she had been a figure skating coach for Katie and Kirby Voit, the daughters of defendant Sharon and her husband Kerry.  Robyn testified that on March 8, 2000, while at a skating competition in Buffalo, New York, Sharon asked Robyn whether she knew any hit men who could "take [Kerry] out.”  Robyn was shocked, but treated it as if Sharon had been joking.  Sharon later blamed Robyn for Kirby’s poor performance at the competition and left an angry message on Robyn’s cellular phone voice mail.  Robyn discussed the matter with Kerry, ultimately arranging a meeting with Kerry.

On March 11, 2000, Robyn met Kerry at a restaurant.  Carl Poe (Robyn’s husband and the Voit daughters’ strength and conditioning coach) also attended, as did Matt Georgopolous (a friend of Kerry’s) and Georgia Hopis (a friend of Sharon’s and a fellow skating mother).  During the meeting Robyn asked Kerry if he knew that Sharon had asked her to hire a hit man to kill Kerry.  Matt told Kerry that he had heard Sharon venting before.  Matt testified that in the summer of 1999, Sharon had  said that she would not be happy until Kerry was dead and that she needed to find someone to kill him, and she had made similar comments twice before.  Carl told Kerry that Sharon had said similar things to him.  Carl testified that in the spring and fall of 1999, when venting her anger toward her husband, Sharon said that she wanted to have him "taken care of” and "gotten rid of.”  Carl had not taken those statements seriously at the time.

Allen Ording, the Voits’ accountant, testified that on March 13, 2000, Sharon called him about tax deductions for the Voits’ cellular phone bills.  During the conversation, Sharon asked whether Kerry had changed the beneficiary on his life insurance policy.  Ording responded that he did not know whether the beneficiary had been changed.

Michelle Cohen, who knew the Voits through her daughter, who also skated, testified that she had known Sharon was unhappy in her marriage since at least 1996.  On March 17, 2000, while watching a skating practice together, Michelle told Sharon that she looked nice.  According to Michelle, Sharon responded that she had someone to look nice for, named Scott Reeder.  Toward the end of the conversation Sharon told Michelle that "something was going to change in the very near future.”  Sharon could not tell Michelle what it was, but said that Michelle would find out in the next few weeks.

On March 14, 2000, Chicago police detective John Duffy interviewed Kerry, who had previously spoken to an assistant State’s Attorney.  The next day, Detective Duffy interviewed Georgopolous and the Poes.  Kerry gave Detective Duffy Sharon’s home and cellular phone numbers.  On March 16, 20030 Detective Duffy arranged for Investigator Tim Kaufmann, of the special operations bureau of the Cook County sheriff’s police department, to assist in the case.

Detective Duffy and Investigator Kaufmann decided to make a "predicate phone call” to Sharon, the "target” of the investigation.  Investigator Kaufmann placed the call, while Detective Duffy listened on an extension and took notes.  The officers testified that in this phone call, Kaufmann stated that he understood that Sharon "had a problem” that she wanted "taken care of.”  Sharon asked whether Scott Reeder had given him her phone number; Kaufmann replied that he did not want to mention any names.  Kaufmann asked whether it was a serious problem; Sharon replied that it was and that she needed it taken care of.

Kaufmann testified that Sharon wanted to meet him in person; Duffy testified that Kaufmann suggested the meeting.  Kaufmann testified that when he suggested meeting in a public place, Sharon suggested the parking lot of a Jewel store at the intersection of Willow and Waukegan at 1:30 p.m. the next day.  Kaufmann described himself and asked what she would be driving.  Sharon told him she would be driving a silver Chevrolet sport utility vehicle.

The officers obtained a consensual overhear warrant, which was valid for 10 days.  The officers assembled a surveillance team to record the meeting on audio and video tape.  Kaufmann was wired with a body microphone, tape recorder and transmitter for a surveillance van.  Three other undercover cars would monitor the entrances to the Jewel parking lot.

The audio and video tapes of Kaufmann’s meetings with Sharon were played for the jury.  Police technicians enhanced the sound on some of the audio cassettes to boost the volume of Sharon’s voice.  The tapes were also transcribed; copies of the transcripts were provided to the jury.

In the first conversation, Sharon is overheard saying that Kerry’s parting words to her in Buffalo were, "I should bash you right now, you deserve it, you should be in jail.”  Kaufmann said that he would solve her problems if she wanted it done.  Sharon said "yep,” and that "it’s gotta be done.”

Kaufmann asked whether she had the money; Sharon said she could get it.  Sharon said that she did not know an exact amount.  Kaufmann asked how much money Sharon could raise.  Sharon replied that "Scott” had mentioned "somewhere around seven possibly.”  Kaufman said that would be reasonable.  Kaufmann then said that this would be their last contact, so that if she told him she wanted it done, it is done.  Sharon replied that there was no doubt in her mind.

Kaufmann then told Sharon that he was a Vietnam veteran, that the government had paid him to kill people, so he had no problem doing anything.  Sharon became quiet, then mentioned that Kerry was going on a scuba diving trip the next week.  

Kaufmann said that he was going to have Sharon write down some information; Sharon replied, "Uh-huh.”  Kaufmann asked whether Sharon had a photo of Kerry to give him; Sharon did not think so.  Kaufmann said he was going to ask about Kerry’s habits and for her phone number, as he had thrown it away after his call the previous day.  Sharon stated that she had a cellular phone which only she used and that no one else saw the bill.  Kaufmann asked her not to confide in anyone about the matter, especially a boyfriend or someone like that; Sharon agreed.  Kaufmann asked if there was anything in particular that she wanted done.  Sharon stated that she just wanted "to have the misery finished” and that she did not want to know how it would happen.

Kaufmann said that he would do it out of state, so that she would not have to deal with local authorities; Sharon said, "All right.”  Kaufmann told Sharon he would need a "deposit” large enough to buy an airplane ticket.  Kaufmann told Sharon to tell him when to do it.  Sharon, after mentioning that her daughter was getting married in July, ultimately answered, "Next week.”

Kaufmann then discussed with Sharon what Kerry did for a living, about his habits, his car, his office, and where he was currently staying.  Kaufmann asked whether Kerry always took the same route to work.  Sharon said that she thought he did.  Kaufmann asked whether Kerry carried a lot of cash or credit cards on his person.  Sharon said that he did.  Sharon said that Kerry was staying with his mother.  Sharon said that she could not remember the mother’s address, but that she had it in the back of the car; Sharon later gave it to Kaufmann.  Sharon said that Kerry usually left for work at 5:30 or 6 a.m. and would probably be leaving from his mother’s house, unless he stayed overnight with Georgopolous.  Sharon told Kaufmann that Kerry was going to be in the Bahamas from Monday to Friday of the next week, but she was not sure what time Kerry was coming back on Friday.

Kaufmann told Sharon he would giver her a post office box number to mail the rest of the money.  Kaufmann asked whether anyone else drove Kerry’s car; Sharon said that Georgopolous did on occasion.  Kaufmann said that he would need a photo of Georgopolous also.  Sharon said that she could get a photo.  Kaufmann asked whether she wanted him to wait and meet her again in the parking lot.  Sharon agreed.

Kaufmann told Sharon that he would make it look like a robbery.  Kaufmann asked whether she wanted him dead in any particular way, whether she wanted the remains.  Sharon said that she did not care and did not want to see him again.  Kaufmann said that it would be out of state and look like a robbery, but that he would not say more, so that she would look shocked when she was told what happened.  Kaufmann and Sharon then discussed the amount of the "deposit” and timing of the later payments to the post office box.  The two then agreed to meet again in an hour or an hour and a half in the same spot.

During that meeting, Sharon wrote out information about Kerry’s employment and car.  She also gave Kaufmann a key to Kerry’s car.  Kaufmann gave her a paper listing a bogus post office box number.

Approximately an hour later, Sharon returned to the parking lot.  Kaufmann got into her car and had another discussion with Sharon.  During this conversation, Sharon gave Kaufmann a photograph of her husband and Georgopolous, with a third person cut out.  She identified Georgopolous as the one "in the yellow.”  Sharon gave Kaufmann $600.  The two further discussed Kerry’s habits.  Kaufmann said that he would telephone Sharon and say, "[T]his is me,” and Sharon would say "yes” or "no.”  When Kaufmann said that Sharon seemed upset, Sharon replied that she had been upset for "a lot of years.” Sharon said that she was "remembering myself when he bloodied my face.”  Kaufmann asked whether she understood that what he was going to do was going to be final.  Sharon said, "yes.”

At the end of the conversation, Kaufmann left Sharon’s car and returned to his own.  The surveillance teams then approached defendant’s car and arrested her.  The piece of paper with the bogus post office box number was found on the floor of Sharon’s car.

After the State rested its case, defendant presented the testimony of Dr. Susan Nowak out of the presence of the jury as an offer of proof.  The parties stipulated that Dr. Nowak was qualified as an expert in forensic psychology.  Dr. Nowak testified that she reviewed police reports from a 1995 domestic battery incident, treatment notes from court-ordered family counseling in 1995 and 1996, abuse counseling notes from 1998, the police reports in this case and records of forensic psychological examinations and psychiatric admissions while Sharon was in jail awaiting trial.  These examinations concluded that Sharon was fit to stand trial, was legally sane at the time of the offense, and was not challenged by symptoms of battered woman syndrome or post-traumatic stress disorder.  Dr. Nowak also interviewed Sharon twice, as well as three of Sharon’s friends, her mother and brother.

Dr. Nowak opined that Sharon had a personality disorder, not otherwise specified, with dependent, obsessive-compulsive and paranoid features.  Dr. Nowak’s report stated that Sharon characterized her marriage "as a series of escalating episodes of physical and mental abuse, punctuated by appeasing, conciliatory behavior by Kerry and periods of calm.”  

Sharon told Dr. Nowak that she met Kerry when she was 15 years old, Kerry was the only man she ever dated, and the two married when she was 20 years old.  Sharon went to work as a dental hygienist and put Kerry through dental school.  Sharon said that she later worked in Kerry’s office and once discovered Kerry in a closet, using cocaine with one of his dental assistants.  Sharon claimed that Kerry also purchased jewelry and a fur coat for the dental assistant, as well as cosigning a loan for her car.

Sharon told Dr. Nowak that she and Kerry were involved in orgies and cocaine.  Sharon claimed that Kerry pressured her into having three-way sex with him and Georgopolous on several occasions, which he and Georgopolous began videotaping.  Sharon claimed that Kerry also encouraged her to have sex with Georgopolous when Kerry was not around, then report the details to him later.

Sharon told Dr. Nowak that Kerry first hit her approximately a week after they got married.  Sharon recounted a 1995 fight in which Kerry knocked her to the ground three times and punched her in the eye.  Sharon blacked out briefly, then went to a neighbor’s house and called the police.

Sharon claimed that Kerry was enraged that he had to participate in court-ordered counseling.  However, after the counseling, the Voit household was relatively peaceful through much of 1997.  The situation then began to deteriorate again; Sharon believed that Kerry might steal their daughters and that Kerry twice tried to sabotage her car to cause an accident.

Sharon told Dr. Nowak that in 1998, Kerry had begun taking his dental assistant on trips.  Sharon claimed that on a family vacation, Kerry was very abusive, at one point having "violent sex” with her, holding her down and putting a pillow over her face.  According to Sharon, Kerry also humiliated her by expressing a desire to have more children to people who knew that Sharon could not have any more children.

After that trip Sharon filed for divorce, but Kerry and an attorney talked her out of it.

According to Dr. Nowak, Sharon believed there was a plot to frame her for the current offense.  Sharon claimed that she first believed that Kaufmann was a divorce lawyer, referred to her by Scott Reeder.  Dr. Nowak believed that Sharon and Scott were initially friends, but later developed a sexual relationship.

Dr. Nowak opined that Sharon’s reactions once she learned Kaufmann was a hit man were vague, confused and befuddled.  Sharon claimed that the idea of having Kerry killed was fed to her as the solution to all of her problems, but she could not do it.  According to Dr. Nowak, Sharon suspected that the meeting was a setup by Kerry to have her killed.  When Sharon was asked about having given Kaufmann the money, Sharon began talking about how the tapes had been altered.  According to Dr. Nowak, Sharon believed that the people who reported her, the police and the judge were all part of a plot against her.

Dr. Nowak also reviewed a report generated by Dr. Alan Morris, which contained similar information regarding the Voits’ abusive relationship.  Dr. Morris had found that Sharon struggles with extreme emotions that overwhelm her at times.  Although Dr. Morris did not find her to be psychotic, he believed Sharon suffered a significant impairment of her ability to perceive and assess her environment.  Dr. Morris opined that Sharon was highly vulnerable to direction and guidance by a strong male figure.

Based on her review, Dr. Nowak opined, to a reasonable degree of medical certainty, that Sharon’s background, psychology and sufferance of domestic abuse made her vulnerable to entrapment and influence.  At the conclusion of her testimony, the trial court reaffirmed its ruling excluding the testimony.

Following closing argument, jury instructions and deliberations, Sharon was found guilty of solicitation of murder for hire and attempted first degree murder.  The trial court denied her posttrial motion and sentenced her to concurrent terms of 23 and 10 years in prison, respectively.

I

On appeal, defendant first contends that the State failed to prove her guilty beyond a reasonable doubt of solicitation of murder for hire.  However, as the State notes in addressing the entrapment issue, "[a] precondition to raising the entrapment defense is that 
the defendant must admit that a crime was committed and that he or she committed it.”
  
People v. Gillespie
, 136 Ill. 2d 496, 501, 557 N.E.2d 894, 896 (1990).  This is because it would be both factually and legally inconsistent for a defendant to deny committing the offense and then to assert as a defense that she committed the offense because of incitement or inducement by authorities.  
Gillespie
, 136 Ill. 2d at 501, 557 N.E.2d at 897.

Defendant claims that 
Gillespie
 does not hold that a defendant whose jury was instructed on entrapment cannot argue the sufficiency of the evidence.  This is true in the narrowest sense--
Gillespie
 involved the refusal of an entrapment instruction--but it ignores the logic of 
Gillespie
, which merely restates well-settled Illinois law.  The fact that defendant here was allowed to deny committing the offense and assert entrapment does not require this court to perpetuate the error.  

In this case, as in 
Gillespie
, the defendant asserts factually and legally inconsistent positions, which is not allowed under Illinois law.  Having asserted the affirmative defense of entrapment in the trial court, defendant cannot claim on appeal that a crime was not committed or that she did not commit it.

II

Sharon next contends that the trial court erred in granting the State’s motion 
in limine
 to exclude the expert testimony of Dr. Nowak that Sharon was vulnerable to entrapment.  Section 7-12 of the Criminal Code of 1961 provides as follows:

"A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this Section is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense.”  720 ILCS 5/7-12 (West 1998).

Motions 
in limine
 are addressed to the trial court's inherent power to admit or exclude evidence; generally, a reviewing court will not disturb the trial court's ruling on motions 
in limine
 absent an abuse of discretion, so long as the trial court exercises its discretion within the bounds of the law.  
Beehn v. Eppard
, 321 Ill. App. 3d 677, 680, 747 N.E.2d 1010 (2001), citing 
People v. Williams
, 188 Ill. 2d 365, 369, 721 N.E.2d 539 (1999).  An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view.  
People v. Illgen
, 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519 (1991).  An application of impermissible legal criteria also justifies reversal.  
Boatmen's National Bank of Belleville v. Martin
, 155 Ill. 2d 305, 314, 614 N.E.2d 1194, 1199 (1993).  However, a reviewing court can sustain the decision of the trial court to admit or exclude evidence for any appropriate reason, regardless of whether the trial court relied on that reason or whether the trial court's reasoning was correct.  See 
People v. Novak
, 163 Ill. 2d 93, 101, 643 N.E.2d 762, 767 (1994).  

Regarding the admissibility of expert testimony regarding a defendant’s vulnerability to entrapment, Sharon cites 
People v. Lambrecht
, 231 Ill. App. 3d 426, 437, 595 N.E.2d 1358, 1366 (1992), where the court granted the State's motion 
in limine
 to exclude expert testimony as to whether the defendant had the capacity, on his own, to formulate a plan to deliver drugs.  The expert in 
Lambrecht
 was allowed to testify at length regarding the defendant’s limited intelligence and personality weaknesses, including the expert’s opinion that defendant had a dependent personality disorder; the only opinion excluded was the opinion on the ultimate issue.  
Lambrecht
, 231 Ill. App. 3d at 438-39, 595 N.E.2d at 1367.  This court held that the jury was entitled to deter­mine the weight to be given to the evidence of defendant's personality weaknesses and to balance that evidence against the evidence that he was predisposed to commit the crime, but concluded that the expert opinion testimony on the ultimate issue was properly excluded because it would have invaded the province of the jury.  
Lambrecht
, 231 Ill. App. 3d at 439, 595 N.E.2d at 1367.  

Although the testimony admitted in 
Lambrecht
 included an opinion that defendant had a dependent personality disorder, the nature of the testimony in that case differs from that which defendant sought to admit in this case.  The testimony admitted in 
Lambrecht
 addressed the defendant’s 
capacity to formulate the illegal activity
.  Indeed, the 
Lambrecht
 court went on to hold that it was proper in that case for the trial judge to ask the expert whether the defendant could distinguish right from wrong, going so far as to state that had the judge 
not
 asked the question, the jury would have been left with an unfair impression.  
Lambrecht
, 231 Ill. App. 3d at 439-30, 595 N.E.2d at 1368.  The testimony excluded in this case did not address defendant’s mental capacity to formulate the illegal activity, only her susceptibility to persuasion.

There is federal precedent holding that psychiatric testimony seeking to demonstrate subjective susceptibility to inducement may be relevant and admissible.  See 
United States v. Nunn
, 940 F.2d 1148, 1149 (8th Cir. 1991); 
United States v. Newman
, 849 F.2d 156, 164 (5th Cir. 1988); 
United States v. Benveniste
, 564 F.2d 335, 339 (9th Cir. 1977).  However, these cases also hold that, even if the psychiatric testimony regarding a defendant's peculiar susceptibilities to entrapment is admissible, the testimony is nevertheless properly excluded if it would "confuse the jury and not shed any light on the issue."  
Nunn
, 940 F.2d at 1149; 
Newman
, 849 F.2d at 164-65; 
Benveniste
, 564 F.2d at 339.

In this case, the trial court ruled that the expert testimony would have invaded the province of the jury, which is a proper basis for excluding such testimony.  Indeed, a reasonable trial judge could have concluded that the evidence sought to be admitted here would have confused the jury.  The evidence defendant sought to admit--primarily a history of physical, mental and emotional abuse Kerry ostensibly inflicted upon Sharon--could have been interpreted by the jury as showing Sharon’s motive for soliciting the murder, thereby proving her predisposition, rather than her susceptibility, to entrapment.  Moreover, the evidence is highly inflammatory.  The danger existed that the jury would let its opinion of Kerry color its verdict.

In short, defendant has not shown an abuse of discretion in excluding the expert testimony in this case, particularly where, as here, the proffered evidence may not have been viewed by the jury as exculpatory.

III

Sharon next contends that the State engaged in prosecutorial misconduct by suggesting to Scott Reeder that Scott was implicated in the offense, leading him to assert his fifth amendment privilege and refuse to testify on Sharon’s behalf.  
The State maintains that it did not threaten Reeder or intimidate him into not testifying.  The State correctly points out that it is not improper for a prosecutor to advise prospective witnesses of the penalties for perjury or to voice disbelief about the veracity of their proposed testimony.  
People v. Eubank
, 46 Ill. 2d 383, 392, 263 N.E.2d 869 (1970)
.  Neither is it inappropriate for a prosecutor to suggest a witness be appointed counsel to be advised of the privilege against self-incrimination.  
People v. Hammond
, 196 Ill. App. 3d 986, 993, 554 N.E.2d 534 (1990)
, 
People v. Pantoja
, 35 Ill. App. 3d 375, 380, 342 N.E.2d 110 (1976)
.  The two-prong test for establishing a violation of a defendant's right to present witnesses in her own behalf in such cases is:  (1) whether the admonitions actually caused the prospective witness to decline to testify, and (2) whether the admonitions are "somehow improper."  
People v. King
, 154 Ill. 2d 217, 224, 608 N.E.2d 877, 
880 (1993).  The facts and circumstances of each case must be considered.  
King
, 154 Ill. 2d at 225, 608 N.E.2d at 881.

In this case, the record shows that when Reeder was subpoenaed by the defense, Reeder’s attorney contacted the State to obtain copies of the audiotaped discussions between defendant and Kauffman.  Reeder’s attorney also asked about areas on which the State might cross-examine Reeder at trial.  The State responded to these requests by providing the discussions, in which Sharon asked whether Kaufmann was referred to her by Scott and at another point to Scott’s estimate of Kaufmann’s price.  The State also stated that Reeder would be cross-examined as to whether Reeder and defendant had an affair and whether he lied about such a relationship to the police.  The trial court properly ruled that there was nothing improper in the State’s conduct on these points, as the State had evidence upon which to base its actions.

IV

Sharon claims that the 20- to 40-year sentencing range for solicitation of murder for hire is unconstitutional in that it violates the proportionate penalties and due process clauses of the Illinois Constitution.  
A statute is presumed constitutional; the party challenging the statute bears the burden of demonstrating its invalidity.  
People v. Moss
,
 206 Ill. 2d 503, 519-20, 795 N.E.2d 208, 219 (2003).
  This court has a duty to construe a statute in a manner that upholds its validity and constitutionality if it can reasonably be done.  
Moss
,
 206 Ill. 2d at 520, 795 N.E.2d at 219
.  The question of whether a statute is constitutional is subject to 
de novo
 review.  
Moss
,
 206 Ill. 2d at 520, 795 N.E.2d at 219.

The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, § 11.
 There are three separate tests to identify a proportionate penalties violation:

"First, a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community.  Second, a penalty is invalid under the proportionate penalties clause where similar offenses are compared, and conduct that creates a less serious threat to the public health and safety is punished more severely.  Third, there is a violation of the proportionate penalties clause when identical offenses are given different sentences."  
People v. Hill
, 199 Ill. 2d 440, 452, 771 N.E.2d 374, 381 (2002)
.

Sharon contends that the sentencing range for solicitation of murder for hire 
is disproportionate when compared to that for conspiracy to commit murder (720 ILCS 5/8-2 (West 1998); 730 ILCS 5/5-8-1(a)(5) (West 1998)) or the range for first degree murder (730 ILCS 5/5-8-1(a) (West 1998)) .

The cross-comparison analysis involves two steps.  First, the court considers whether the purposes of the compared statutes are distinct such that comparative proportionality review is not appropriate.
  
Hill
, 199 Ill. 2d at 454, 771 N.E.2d at 382-83.
  Second, 
if the purposes are related
, we consider whether the offense with the harsher penalty is more serious than the offense with the less severe penalty.
  
Hill
, 199 Ill. 2d at 454, 771 N.E.2d at 382-83.
  
It is inappropriate to compare offenses and their penalties unless they have common statutory purposes. When offenses have different purposes, our courts presume that the legislature considered different factors in establishing the penalties for them and defer to its judgment.  
People v. Lombardi
, 184 Ill. 2d 462, 476
, 705 N.E.2d 91, 99 (1998).

Sharon asserts that the purposes of the solicitation and conspiracy statutes are the same:  to punish inchoate acts whose goal is murder.  The argument fails because Sharon was convicted of solicitation of murder 
for hire
, not mere solicitation of murder.  The conspiracy statute Sharon cites does not involve hiring a murderer.  The purpose of the solicitation-of-murder-for-hire statute is not merely to punish inchoate acts whose goal is murder
, but to punish those who would hire a murderer.  Thus, Sharon’s argument fails before reaching the second prong of the analysis.

Sharon’s argument comparing solicitation of murder for hire and first degree murder fails for the same reason:  the statutes have different purposes.  Moreover, while the two offenses share the same mandatory minimum, the sentencing range for first degree murder--20 to 60 years--is greater than the range for solicitation of murder for hire.

Sharon’s due process argument is an artful restatement of her other arguments.  Sharon argues that the statutory sentences for solicitation of murder for hire punish persons equally or more for the risk of murder than the punishment for murder itself.  As shown above, this is not universally true.  Moreover, as noted above, Sharon fails to address the argument that the legislature may single out the hiring of murderers as a particular evil distinct from the murder itself.  Nor does she address the State’s observation that if the murder is then carried out, the solicitation merges with the choate offense of murder and is subject to potentially greater penalties.  Accordingly, defendant’s argument fails.

V

Sharon contends that the trial court erred in considering the nature of the offense as the sole aggravating factor in sentencing Sharon.  The State responds that Sharon waived the issue by failing to raise it in a postsentencing motion.  A defendant should make any challenges to the correctness of a sentence or a sentencing hearing by written motion within 30 days of the sentence.  
People v. Reed
, 177 Ill. 2d 389, 393-94, 686 N.E.2d 584, 586 (1997).  Impermissible or illegal sentences may be attacked on appeal as plainly erroneous even though no postsentencing motion was filed.  
People v. Whitney
, 297 Ill. App. 3d 965, 967, 697 N.E.2d 815 (1998).  "The plain error rule may be invoked if the evidence at a sentencing hearing was closely balanced[] or if the error was so egregious as to deprive the defendant of a fair sentencing hearing."  
People v. Hall
, 195 Ill. 2d 1, 18, 743 N.E.2d 126, 136 (2000).  The second prong of the plain error rule should be invoked only when the possible error is so serious that its consideration is "'necessary to preserve the integrity and reputation of the judicial process.' [Citation.]"  
People v. Hampton
, 149 Ill. 2d 71, 102, 594 N.E.2d 291, 305 (1992).  The rule is not a general saving clause for alleged errors but is designed to redress serious injustices.  
People v. Helm
, 282 Ill. App. 3d 32, 34, 669 N.E.2d 111, 113 (1996).

In this case, as in 
People v. Martin
, 119 Ill. 2d 453, 458-59, 519 N.E.2d 884, 886-87 (1988), the evidence was not merely closely balanced, but strongly favored leniency.  The transcript shows that the trial court recognized this.  The transcript also shows that trial court stated that "the aggravating factor in this case is the crime itself.”  It is improper to consider factors inherent in the offense as aggravating factors, as the legislature has already presumably done so.  Yet this was the only aggravating factor listed by the trial court.  Accordingly, the issue may be reviewed under the plain error doctrine.

A trial court's reliance upon an improper factor does not always necessitate remandment for resentencing
; 
where it can be determined from the record that the weight placed upon the improperly considered aggravating factor was insignificant and that it did not lead to a greater sentence, remandment is not required
.  
People v. Beals
, 162 Ill. 2d 497, 509-510, 643 N.E.2d 789, 795-96 (1994).  Here, the sentence imposed was 23 years, which is near the bottom of the statutory range.  However, as noted above, the improper factor was the only aggravating factor specifically identified by the trial court.  Accordingly, this court concludes that the sentence should be vacated and the case remanded for resentencing.

VI

Sharon argues that her conviction for attempted murder must be vacated under the "one act, one crime” rule of 
People v. King
, 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844-45 (1977).  In 
King
, our supreme court held that a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act.  
King
, 66 Ill. 2d at 566, 363 N.E.2d at 844-45.  There are two steps to a King analysis.  
People v. Rodriguez
, 169 Ill. 2d 183, 661 N.E.2d 305 (1996).  First, the court ascertains whether the defendant's conduct consisted of a single physical act or separate acts.  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 306-07.  An "act" is any overt or outward manifestation that will support a separate offense.  
King
, 66 Ill. 2d at 566, 363 N.E.2d at 844-45.  "Multiple convictions are improper if they are based on precisely the same physical act."  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 306.
  

Second, if the defendant committed multiple acts, the court determines whether any of the other offenses are lesser-included offenses.  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 306.  If any of the offenses are lesser-included offenses, then, under 
King
, multiple convictions are improper.  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 306. If none of the offenses are lesser-included offenses, then multiple convictions may be entered.  
Rodriguez
, 169 Ill. 2d at 186, 661 N.E.2d at 307.  

In this case, defendant argues only that the solicitation of murder for hire and the attempted murder are based on the same physical act.
  Sharon relies entirely on 
People v. Crespo
, 203 Ill. 2d 335, 342, 788 N.E.2d 1117, 1121 (2001)
, in which the court examined the charging documents and the way the State presented the case in closing arguments.  The charging documents in this case differentiated the offenses charged.  Sharon was charged with solicitation of murder for hire based on her encouragement of Kaufmann.  Sharon was charged with attempted murder by providing Kaufmann not only the money, but also personal information about Kerry, a photograph of Kerry, and Kerry’s car key--all acts beyond those required to prove solicitation of murder for hire.  A review of the trial transcript shows that the State argued that these acts were the substantial steps toward committing murder for the purpose of the attempted murder charge.  Sharon notes that the jury instruction did not list these specific acts, but cites no authority holding that an itemized instruction is required.  Thus, there is not a "one act, one crime” error under 
King
 and 
Crespo
.

VII

Finally, Sharon contends her mittimus should be corrected, as it erroneously reflects four counts of attempted first degree murder.  The State agrees.  Accordingly, the mittimus should be so corrected when defendant is resentenced.

For all of the aforementioned reasons, defendant’s convictions are affirmed; defendant’s sentence for solicitation of murder for hire is vacated and the case is remanded for further proceedings consistent with this opinion.

O'BRIEN and NEVILLE, JJ., concur.