2021 IL App (1st) 171962-U

No. 1-17-1962

Order filed June 28, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 C3 30689 |
| | ) | |
| FRANK MENDEZ, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE WALKER delivered the judgment of the court.
Justices Hyman and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's sentence is affirmed where the court did not consider an improper factor in aggravation, and the consecutive sentences for home invasion and aggravated criminal sexual assault were not excessive based upon the nature of the offenses and the surrounding circumstances.

¶ 2    Following a jury trial, defendant Frank Mendez was convicted of home invasion (720 ILCS 5/19-6(a)(2) (West 2014)) and aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(5) (West Supp. 2015)) and sentenced to consecutive terms of 60 years' and 30 years' imprisonment,

respectively. He appeals, arguing that the trial court considered an improper factor in aggravation, namely, his silence in allocution, and that his sentence was excessive because the court did not sufficiently consider his mitigating factors. We affirm.

¶ 3                                         BACKGROUND

¶ 4      Defendant was charged by information with 12 counts related to an incident on August 20, 2015, against M.C., who was 97 years old. At trial, the State proceeded on counts I and II for home invasion predicated on causing injury to an occupant and criminal sexual assault, respectively, and count III for aggravated criminal sexual assault predicated on knowingly penetrating M.C.'s sexual organ while she was more than 60 years old. All three counts advised that the State sought extended-term sentencing predicated on M.C.'s age.

¶ 5      Prior to trial, the court denied defendant's motion to quash arrest and suppress evidence of defendant's statement, DNA evidence, and fingerprint evidence. Later, the court also denied defendant's subsequent motion to suppress his statements. The court granted the State's pretrial motion to admit certain statements from M.C., who was deceased by the time of trial, including her preliminary hearing testimony, statements she made immediately following the incident, and her statements to medical personnel.[1] The court also allowed the State to enter evidence that defendant broke into another home in the area earlier on the day of the incident.

¶ 6      At trial, Patrick C., M.C.'s son, testified that on August 20, 2015, M.C. lived by herself in the Church Creek retirement community in Arlington Heights, Illinois. Early in the morning of August 21, 2015, Patrick's brother called and informed him that M.C. was in the hospital. Patrick

---

[1] M.C. testified twice at the preliminary hearing because she was not sworn for the initial testimony, though she later adopted the first testimony while under oath during her second testimony. The court allowed both testimonies to enter evidence.

visited her in the hospital, and observed extensive bruising and cuts on her face, neck, and hands. She was released on August 22, 2015, and never returned to Church Creek, staying in treatment centers until her death on December 30, 2015.

¶ 7    Kathleen Pagano, a court reporter, read M.C.'s November 3, 2015 preliminary hearing testimony into the record. M.C. stated that on August 20, 2015, she lived alone at Church Creek. She wore a medical alert device on her wrist. That evening, she awoke to find an uninvited man in her bedroom. The man hit her face, and continued to hit her as she struggled against him. The incident continued until M.C. was on the floor of her bathroom, where the man continued to hit her. The man also touched her "breast" and "privates" with his hand. He beat her until she heard someone else's voice. She did not remember who had entered the room when the man stopped or whether the police arrived.

¶ 8    On cross-examination, M.C. testified that she was unable to see her attacker's features. He did not speak, and she did not believe he had a weapon. M.C. could not tell if he was sober or intoxicated. She could not remember if he placed his hand by her vagina, and did not feel him touch her vagina.

¶ 9    On redirect examination, M.C. testified that the man touched her "privates," by which she meant her vagina. On recross-examination, M.C. testified she thought defendant might have touched her vagina, believed she had her nightgown on throughout the incident, and could not remember if the man touched her above or underneath her clothing.

¶ 10    Later, on November 3, 2015, the State recalled M.C., who testified that she woke and realized someone was in her apartment because she heard noise. The man first touched her chest, and she resisted him, at which time he started beating her. He hit her "[m]any times." She denied

that the man touched her privates. She then responded to a question, "Do you remember whether or not he touched your private parts?" with "I don't remember." On cross-examination, she testified that she did not think the man touched her anywhere besides her chest, and denied that he touched her vagina. On redirect, she testified that she did not remember being naked when a security guard entered her room after the man left, but she did recall that someone gave her a robe.

¶ 11    Luis Sauceda testified that he worked at Church Creek as a security guard on August 20, 2015. At 10:43 p.m. that evening, he received an alert from M.C.'s medical bracelet. Sauceda called M.C., and when she did not answer the phone, he responded to her apartment. He knocked on the door, and when she again did not respond, Sauceda entered the apartment and heard someone moaning in the bathroom. M.C. then approached Sauceda from the bathroom, and he observed that she was in "shock" and "had no clothes on." Sauceda gave her a robe. M.C. "kept saying 'He hit me, and he raped me.'" She also stated she had pain in her private parts. Sauceda called 911, then stayed with M.C. until the police arrived.

¶ 12    Felicia Coradini, a registered nurse, testified that she treated M.C. on August 20, 2015. Coradini asked M.C. what happened, and she relayed that someone pulled her into the bathroom and was "violent" with her. M.C. said she thought the man vaginally penetrated her. Coradini performed a sexual assault kit on M.C. Coradini collected samples from M.C.'s neck, forearm, mouth, vagina, pubic hair, fingernails, and hair. M.C. had "external bleeding around her vagina," as well as bruising on her face and neck, skin tears on her left arm and right elbow, and lower abdominal tenderness. Coradini believed it was "not normal" for someone M.C.'s age to have "vaginal bleeding without injury or trauma."

¶ 13    Dr. Theresa Gandor testified that she treated M.C. on August 21, 2015. Gandor noted that M.C. had bruising on her cheek, chin, and right shoulder. She also had tenderness in her neck, ribs, and middle and lower back; skin tears on her wrist and left elbow; a minimal bruise to the clitoris area; a minimal abrasion to the left clitoris; blood in her vaginal vault; and vaginal wall irritation. M.C. received pain medication and a morphine shot to treat her pain.

¶ 14    On cross-examination, Gandor testified that M.C. relayed she did not remember if she was "hit or sexually assaulted," and was not sure "if there was vaginal or rectal or oral penetration." Gandor agreed it was possible the blood in M.C.'s vaginal vault could occur absent trauma.

¶ 15    Kelly Jacobs, sales director for Church Creek, testified that she saw M.C. earlier in the day on August 20, 2015, and M.C. did not have any visible injuries at that time.

¶ 16    Arlington Heights police officer Ray Finnerty testified that he served as an evidence technician for M.C.'s case on August 20 and 21, 2015. Finnerty photographed M.C.'s apartment, and identified photographs of a knife on the window ledge and a cut screen from the window in the bedroom. He also collected fingerprints from the apartment, and took samples from the bathroom floor, cabinet, and sink, as well as from bloodstains on the wall near the bedroom window. Finnerty also collected pants, underwear, and shoes from the scene.

¶ 17    N.M., a minor, testified that on August 20, 2015, a man broke into his family's home near Sunset Meadows Park in Arlington Heights. N.M. saw the man in a hallway, and identified defendant in court as that man. N.M.'s mother and sister also saw defendant during the incident, and both screamed. Defendant left in response, and the police arrived shortly thereafter. On August 25, 2015, N.M. went to the police station and described defendant to Sergeant Joe Pinello, who

generated a police sketch from the description. The parties stipulated that N.M. identified defendant in a photo array on September 25, 2015.

¶ 18    Arlington Heights police officer Christopher Sefton testified that on September 24, 2015, while driving in an unmarked vehicle, he saw defendant riding a bicycle near the 500 block of East Golf Road. Sefton believed defendant matched Pinello's sketch, which Sefton had seen at the Arlington Heights Police Department. The area was approximately a mile from Church Creek. Sefton identified defendant in court. Sefton pulled alongside defendant and identified himself. Defendant stopped briefly, then fled on the bicycle. Sefton radioed for backup, and after a short pursuit, during which defendant entered an area through which Sefton could not drive, Sefton heard over the radio that other officers had arrested defendant.

¶ 19    Arlington Heights police officer Petar Milutinovic testified that he learned on September 24, 2015, that defendant had been arrested. Milutinovic met with defendant, whom he Mirandized and then interviewed regarding the incident at N.M.'s home. Defendant stated that he drank beer in the park that night, then rode his bicycle to Sunset Meadows Park "to look at women." He saw N.M.'s mother in the park, followed her home, and entered the house through the back door. When he entered, "everybody screamed," so he left. Defendant said that he followed N.M.'s mother home "to see if she wanted to have sex." He further said that he unzipped his pants and placed his hand near his fly during the incident because "he had to go to the bathroom." Defendant's statement was reduced to writing, which he signed. The State introduced the statement into evidence as People's Exhibit No. 62. Defendant also said in the statement that he wanted "to stop drinking alcoholic beverages so I don't find myself in these situations." Defendant agreed to provide a buccal swab

for DNA testing, which Milutinovic collected, along with defendant's fingerprints. Milutinovic submitted the fingerprints to the FBI database.

¶ 20    Charles Schauer, a latent fingerprint examiner, testified that on August 21, 2015, he received samples from M.C.'s apartment and unsuccessfully searched for a match in the FBI database. On September 25, 2015, he received a notification that recently entered fingerprints in the database belonging to defendant were a potential match for the latent fingerprint samples collected from M.C.'s apartment. Schauer compared defendant's fingerprint information with that of the latent fingerprints collected from the scene, and determined defendant's prints matched three palm prints and one partial fingerprint. Prior to trial, Schauer also compared the FBI database information for defendant's fingerprints with a photograph of a print near M.C.'s bedroom window, and determined it to be a match.

¶ 21    The State entered a stipulation that if called, Illinois State Police forensic scientist Ronald Tomek would testify that he received M.C.'s sexual assault kit and concluded from his analysis thereof that the vaginal swabs had bloodstains. The State entered another stipulation that Illinois State Police forensic scientist Janice Youngstead would testify that she received defendant's buccal swab and identified a DNA profile therefrom.

¶ 22    Lisa Fallara, an Illinois State Police forensic scientist, testified that she received DNA evidence in connection with M.C.'s case, and concluded that the swab from M.C.'s forearm contained a DNA profile that matched defendant's DNA profile. The profile would be expected to occur in 1 in 2000 unrelated African American males, 1 in 2400 unrelated Caucasian males, and 1 in 1500 unrelated Hispanic males. Fallara also matched defendant's DNA profile to a male profile identified in one of the shoes recovered from the scene. The profile would be expected to occur in

approximately 1 in 170 million African American, 1 in 23 million Caucasian, and 1 in 8.1 million Hispanic unrelated individuals. Fallara also matched defendant's DNA profile to a male profile found in the sample collected from M.C.'s neck. The profile would be expected to occur in approximately 1 in 3.2 sextillion African American, 1 in 4.6 quintillion Caucasian, or 1 in 200 quadrillion Hispanic unrelated individuals.

¶ 23     At the conclusion of the State's case-in-chief, the circuit court denied defendant's motion for a directed verdict. Defendant entered three exhibits into evidence, a "hospital report" regarding M.C.'s treatment following the incident, a police report, and a photograph of M.C.'s legs, then rested. At defendant's request, the court instructed the jury regarding the lesser-included offense of criminal trespass to a residence.

¶ 24     Following closing arguments, the jury found defendant guilty of home invasion causing injury, home invasion involving criminal sexual assault, aggravated criminal sexual assault, and criminal trespass to a residence. The jury also found that M.C. was over age 60 at the time of the home invasion offenses.

¶ 25     At a posttrial proceeding, the court denied defendant's motion for a new trial. The matter moved to sentencing.

¶ 26     Defendant's presentence investigation (PSI) report showed that he was 51 years old at the time of the incident. He had prior convictions for public indecency and twice driving on a suspended or revoked license. Defendant reported that he was the second of five children and had a "normal and happy" childhood, though his family "struggled financially." He denied abuse or neglect, and said his mother ensured his needs were met. Defendant left school in fourth grade, but later earned a GED. He moved to Chicago when he was 22 years old to live with his brother Rick

and seek employment. Defendant worked "side constructions jobs" for a living. He had not had contact with his parents or other siblings in years at the time of the interview. Though unmarried, he had two children from a previous relationship, with whom he had not had contact in approximately five years.

¶ 27    Defendant reported that he and Rick recently had an argument, and defendant left their home and moved to a rented room in Mount Prospect, Illinois. Defendant denied any previous mental health treatment and believed he did not need to speak to a mental health professional, though he reported that during the month preceding his arrest, he started drinking alcohol for the first time, and drank as much as a case of beer daily. He started drinking due to the issues with Rick.

¶ 28    Mitigation specialist Carly Offidani-Bertrand submitted a report to the court prior to sentencing. Therein, Offidani-Bertrand noted that defendant had "almost no criminal record" prior to this incident. She relayed that defendant had learning and intellectual difficulties for which he was never evaluated or treated. His childhood home in Mexico was "highly impoverished." Defendant's father drank heavily and was physically abusive. Defendant had learning difficulties due to a traumatic head injury he suffered in infancy. Rick believed that defendant's head injury contributed to social and emotional difficulties throughout defendant's life, including "strong and violent mood swings." Defendant also struggled economically, which he reported caused him "great emotional hardship." He became a born-again Christian in 1997 and was active in his church for years, but struggled socially within the church, due in part to what defendant perceived as discrimination against Latinos.

¶ 29    Offidani-Bertrand believed that defendant suffered from depression due to his economic and social circumstances, and turned to alcohol as a result. She believed defendant "sunk into a spiral of depression before the instant offense," and "in his despair and alcoholism he was barely conscious of his own actions" and "did not intend to cause harm to others." She concluded that defendant did not contemplate his conduct would harm another, substantial grounds existed to excuse his conduct, he had a limited criminal history, and his character and attitude showed he was unlikely to reoffend.

¶ 30    The State called Donna C., M.C.'s daughter-in-law, who read a victim impact statement explaining that M.C. was the "matriarch, heart, and soul" of their family and the incident would "always tear at" their hearts. Following the incident, M.C. could no longer live on her own and "required constant care and treatment." She spent the end of her life "unhappy and troubled, always anxious, always afraid."

¶ 31    In aggravation, the State argued that defendant only stopped his attack because Sauceda intervened, and should not "be on the street again" because he was a "danger" to the "most vulnerable" members of the community. The prosecutor continued that defendant took away M.C.'s "health" and "sense of safety," and should be "in prison for the rest of his life."

¶ 32    In mitigation, defense counsel referenced the mitigation report and called Offidani-Bertrand, who testified that defendant "endured beatings as well as alcoholism and violence in domestic partnerships." Defendant's father physically abused him when defendant was young, sometimes to the point that he lost consciousness. He did not receive social services during his childhood in Mexico, and dropped out of high school. During this time, some members of his

family moved to northern Mexico without him. Defendant later moved to the United States to live with Rick.

¶ 33    Defendant struggled to find consistent work in the United States, which he partially attributed to racial discrimination. Defendant also experienced racial discrimination in his church, which prompted him to leave. Offidani-Bertrand believed this led to defendant developing "major depression," for which he did not undergo treatment. Defendant had no other social relationships, and "began drinking very heavily." She did not believe defendant could control his behavior at the time of the incident.

¶ 34    On cross-examination, Offidani-Bertrand acknowledged that no physician had diagnosed defendant with depression, and she did not know if he took medication for depression. She was aware that defendant told the PSI investigator that he did not believe he needed to speak to a mental health professional and that he had a normal and happy childhood. She agreed that people that who commit "sex crimes" were likely to reoffend, but believed that defendant did not intend to "commit another sex crime." On redirect, Offidani-Bertrand agreed that this belief was contingent on defendant receiving treatment for his psychological and alcohol issues.

¶ 35    Defendant did not speak in allocution.

¶ 36    Defense counsel argued that the mitigation report showed that defendant's behavior could be explained, if not excused, and he had rehabilitative potential. Counsel described the evidence of aggravated criminal sexual assault as "minimal," argued that M.C. did not suffer great bodily harm, and asked the court not to sentence defendant to an extended term based on M.C.'s age because a "minimal" sentence was appropriate.

¶ 37    The court merged the findings of guilt for criminal trespass and home invasion predicated on criminal sexual assault (count II) into home invasion predicated on causing injury (count I), specifying that M.C. did not suffer great bodily harm. The court imposed a 60-year extended-term prison sentence on count I for home invasion, based on M.C.'s age, and a consecutive 30-year prison sentence on count III for aggravated criminal sexual assault.

¶ 38    The court stated that it considered the factors in aggravation and mitigation, the PSI report, the mitigation report, and the testimony of the witnesses at sentencing. It mentioned that "defendant made no statement for sentencing," and that it believed defendant's actions showed "planning and premeditation" and "shocked the moral conscience" of the community. The court believed defendant was a "tremendous danger" and "picked on the weakest most vulnerable members of society." It called defendant's conduct "unconscionable, reprehensible, despicable and pure evil," and believed "further damage" would have occurred had M.C.'s bracelet not activated.

¶ 39    The court acknowledged that some information in the mitigation report conflicted with the PSI report, including how defendant characterized his childhood. The court did not dispute that defendant had a difficult life, but disagreed with the mitigating factors described by Offidani-Bertrand. Rather, according to the court, defendant did not exhibit "remorse for [his] actions in this case, in this courtroom whatsoever," he "never acknowledged the wrongfulness of [his] conduct," and "society needs to be protected" from him. Moreover, as the police arrested defendant while he rode his bicycle near the site of the incident and defendant fled prior to arrest, the court believed defendant had a "high rate of recidivism" and that treatment would not help him conform his conduct.

¶ 40    The court denied defendant's motion to reconsider sentence.

¶ 41                                    ANALYSIS

¶ 42    On appeal, defendant first argues that the trial court considered an improper factor in aggravation, specifically his silence in allocution.[2] Mendez also argues that his sentence was excessive because the court did not adequately consider his mitigating factors. We will address each argument separately.

¶ 43    Although a sentencing court's decision is entitled to substantial deference (*People v. Snyder*, 2011 IL 111382, ¶ 36), whether the court considered an improper factor at sentencing is a matter of law that we review *de novo* (*People v. Bowen*, 2015 IL App (1st) 132045, ¶ 49). The court may consider a defendant's lack of remorse at sentencing, but it may only do so through competent evidence. *People v. Mulero*, 176 Ill. 2d 444, 462 (1997). Accordingly, when weighing a defendant's remorse or lack thereof, the court may not consider a defendant's silence in allocution because the defendant's constitutional right to remain silent extends to sentencing. *Id.* at 462-63.

¶ 44    The reviewing court considers the entirety of the sentencing proceeding, not one isolated statement, when assessing a sentence's propriety. *People v. Jones-Beard*, 2019 IL App (1st) 162005, ¶ 26 (citing *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986)). The reviewing court will presume that the sentencing court considered only appropriate factors at sentencing unless this presumption is positively rebutted by the record. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). If the reviewing court determines that the sentencing court considered an improper factor

---

[2] Defendant did not preserve this claim through a timely objection and inclusion in a post-sentencing motion and did not request in his brief that we exercise plain error review of this issue. Because the State has failed to argue defendant's waiver by failing to file a brief, however, it has forfeited any argument that defendant forfeited his claim. See *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000).

in aggravation, remand is not automatic. *People v. Voit*, 355 Ill. App. 3d 1015, 1028 (2004). Rather, remand is inappropriate where the reviewing court can determine from the record that the sentencing court's "reference to the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Shanklin*, 2014 IL App (1st) 120084, ¶ 91.

¶ 45    Here, the record shows that the trial court emphasized the facts underlying defendant's crime and the hardship M.C. faced during and after the incident as aggravating factors. The court highlighted the severity of defendant's conduct, which it believed "shocked the conscience" of the community, and that the crime was egregious because M.C. was vulnerable and elderly. The court considered the contradictions between defendant's statements to the PSI investigator and to Offidani-Bertrand regarding his childhood and other topics. The court stated that it disagreed with Offidani-Bertrand's conclusions regarding defendant's mitigating factors, and explained that, counter to Offidani-Bertrand's findings, it believed defendant did not show "any remorse for [his] actions in this case, in this courtroom whatsoever." Instead, the court believed the public needed to be protected from defendant, particularly where the police arrested him following a chase when he was again in the area near Church Creek.

¶ 46    Based on this record, we find the court did not erroneously consider an improper aggravating factor. Instead, the record suggests that the court used competent evidence in concluding that defendant lacked remorse. Defendant made extensive statements to the PSI investigator and to Offidani-Bertrand that were introduced into the record at sentencing, and the court referenced defendant's comments to both immediately before stating that defendant did not show remorse "in this courtroom." A reasonable interpretation of these comments is that the court

considered the statements defendant made to the third parties and the other evidence to conclude that defendant was not remorseful for his actions.

¶ 47   Even if we accept the argument that the court referenced defendant's silence at allocution as an aggravating factor, we find that in view of the entire proceedings, the record shows that the reference played an insignificant role in defendant's sentence such that remand would be inappropriate. See *Voit*, 355 Ill. App. 3d at 1028. The court emphasized at length the shocking nature of defendant's conduct and only once mentioned that defendant did not show remorse, which demonstrates that the nature of defendant's underlying conduct was the court's overriding concern at sentencing.

¶ 48   Defendant next argues that his sentence was excessive because the court did not adequately consider his mitigating factors.

¶ 49   A sentencing court must consider both the seriousness of the crime and the defendant's rehabilitative potential at sentencing. Ill. Const. 1970, art. 1, § 11. The sentencing court is accorded deference in its ultimate decision, in part because it is better positioned than a reviewing court to consider a defendant's "credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209. The seriousness of the crime is the most important factor at sentencing, and the sentencing court need not weigh mitigating evidence over the seriousness of the crime. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53. Where a defendant submits evidence in mitigation, the sentencing court will be presumed to have considered it, absent a showing from the record to the contrary. *People v. Thompson*, 222 Ill. 2d 1, 37 (2006). The court need not list each factor it considered in arriving at its sentence. *People v. Davis*, 93 Ill. 2d 155, 162-63 (1982).

¶ 50 A court's sentence is reviewed for abuse of discretion. *Snyder*, 2011 IL 111382, ¶ 36. Even when a sentence is within the applicable sentencing range, it could be reversed if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210.

¶ 51 As charged here, defendant's applicable sentencing range for the Class X offense of home invasion was 30 to 60 years' imprisonment because the court extended defendant's sentence based on M.C.'s age. See 730 ILCS 5/5-4.5-25 (West 2014); Pub. Act 99-180 (eff. July 29, 2015) (amending 730 ILCS 5/5-5-3.2). The court sentenced defendant to the maximum of 60 years' imprisonment. The sentencing range for his Class X aggravated criminal sexual assault was 6 to 30 years. 720 ILCS 5/11-1.30(a)(5) (West Supp. 2015). The court again sentenced defendant to the maximum, 30 years' imprisonment, to be served consecutively, for a total of 90 years' imprisonment.

¶ 52 Defendant argues that the trial court failed to sufficiently consider certain mitigating factors, specifically his alleged childhood trauma, his alleged intellectual disability, depression, and alcohol abuse around the time of the incident, his work history, and the fact of his requirement to register as a sex offender because of the conviction.

¶ 53 The record contains two written reports the court considered at sentencing, the PSI report and the mitigation report prepared by Offidani-Bertrand, who also testified at sentencing. The PSI report showed that defendant had a prior offense of public indecency. Defendant told the PSI investigator that he had a good childhood and no history of mental health issues, though he recently had a falling out with his brother and started drinking alcohol. Defendant worked in construction since moving to the United States.

¶ 54    Offidani-Bertrand's report stated that defendant had a difficult childhood, his father abused him, and he suffered from alcoholism and depression which prevented him from controlling his actions. She believed defendant had rehabilitative potential if given the proper treatment, and was unlikely to reoffend.

¶ 55    At sentencing, Donna C. read her victim impact statement into the record, and Offidani-Bertrand testified consistently with her report. After argument, the court stated it considered the PSI report, the mitigation report, the witness testimony, and the factors in aggravation and mitigation. The court specified that it considered defendant's difficult circumstances in life, but disagreed with Offidani-Bertrand's conclusions.

¶ 56    Defendant argues that the sentence is improper because the court did not sufficiently consider his mitigating factors, but this argument is belied by the record. The court stated that it considered the factors in aggravation and mitigation, the PSI report, and mitigation reports.

¶ 57    The court here was within its discretion to weigh the seriousness of defendant's conduct over his mitigating factors. Defendant's actions were of such a serious nature that a reasonable court could conclude, as the court did here, that the maximum sentence was appropriate. Defendant was found guilty of breaking into the home of a 97-year-old woman, then physically harming and sexually assaulting her. A maximum sentence for such conduct is not disproportionate to the nature of the offense or at variance with the spirt and purpose of the law, and thus the court did not abuse its discretion. We find that the court's sentence was not excessive based upon the nature of the offenses and the surrounding circumstances.

¶ 58                                    CONCLUSION

¶ 59    For the reasons explained above, the court's sentence is affirmed.

¶ 60     Affirmed.